Argued and submitted January 5, reversed and remanded with instructions on
appeal; affirmed on cross-appeal August 29, 2001

## MULTNOMAH COUNTY EMPLOYEES UNION,
Local 88, AFSCME AFL-CIO,
*Respondent - Cross-Appellant,*

*v.*

## MULTNOMAH COUNTY,
*Appellant - Cross-Respondent.*

9802-01414; A107076 (Control) and A108717

31 P3d 499

Jacqueline A. Weber, Assistant County Counsel, argued the cause for appellant - cross-respondent. With her on the briefs was Thomas Sponsler, County Attorney.

Kevin Keaney argued the cause and filed the briefs for respondent - cross-appellant.

Before Edmonds, Presiding Judge, and Armstrong and Kistler, Judges.

KISTLER, J.

## KISTLER, J.

Plaintiff filed this action seeking a declaration that Multnomah County was violating ORS 181.653[1] by allowing noncertified employees to perform tasks that only certified parole and probation officers may perform. Plaintiff also sought an injunction prohibiting future violations. The trial court ruled in plaintiff's favor. The county appeals, arguing that the trial court interpreted ORS 181.653 too broadly. Plaintiff cross-appeals, arguing that the trial court should have awarded it attorney fees. On appeal, we remand with instructions to declare the county's policy for using noncertified employees valid and to vacate the trial court's injunction; on cross-appeal, we affirm.

The county employs approximately 175 persons in its community corrections program, which is responsible for supervising criminal offenders on probation and parole. Of those employees, approximately two-thirds are parole and probation officers (POs) who have been certified by the Board of Public Safety Standards and Training (BPSST);[2] the remaining third are noncertified corrections technicians (CTs). Plaintiff is a labor union that represents both groups of employees.

During the years leading up to this case, the county implemented several changes in response to budgetary restraints that created staffing shortages. The county determined that it could not hire enough POs to provide adequate supervision of the offenders who presented the greatest risk to the community. Rather than spread the POs' time and efforts evenly among all offenders without regard to risk, the county decided to have POs spend the bulk of their time with high- and medium-risk offenders. The remaining offenders fell into limited- or low-risk categories, and the department determined that they needed less supervision than higher-risk offenders.

---

[1] Unless otherwise noted, all references in this opinion to ORS chapter 181 are to the 1997 version of the statute.

[2] BPSST refers to both the Board of Public Safety Standards and Training and the Department of Public Safety Standards and Training. *See* Or Laws 1999, ch 112, § 3 (the Department will provide the training and certification functions that the Board previously had provided for probation and parole officers).

To supervise limited- and low-risk offenders, the department created a "case bank," which operates largely on a self-reporting basis. After determining that an offender presented only a limited or low risk to the community, a PO would meet with the offender and create an "action plan" that would set out the offender's probation and reporting requirements. After an offender is assigned to the case bank, there is little direct supervision. Offenders typically report once a month, often by telephone or mail, and are placed into an "electronic probation record system" that automatically notifies the department and law enforcement agencies if an offender has been reported for committing new crimes. On occasion, CTs would initiate contact with offenders and treatment providers at the request of a PO to monitor compliance. CTs would then chronicle the information they obtained and relay it to the PO.

In November 1996, we held that, under ORS 181.653(1) and ORS 181.610(14),[3] employees who had not been certified by BPSST could not perform certain functions without the involvement of certified POs. *FOPPO v. Washington County*, 142 Or App 252, 920 P2d 1141 (1996). In response to that decision, the county re-examined the role that noncertified employees could play in the probation process and made additional changes to its parole and probation system. After consulting with legal counsel, the deputy director of the county's community justice department sent a memorandum in December 1997 to department employees clarifying the role of CTs. The memorandum sets out the following 10 "Duties and Responsibilities," which are "to be performed by [CTs] at the direction of [POs]":

"[1]   Interview offenders in office to obtain information as requested by [PO].

_____

[3] ORS 181.653(1) provides that "no person may be employed as a parole and probation officer for more than one year unless the person * * * has been certified as being qualified as a parole and probation officer." ORS 181.610(14) defines "parole or probation officer" as

"any officer * * * who is charged with and actually performs the duty of community protection by controlling, supervising and providing reformative services for adult parolees and probationers, or who performs the duty of investigation of adult offenders on parole or probation or being considered for parole or probation."

"[2]    Inform offenders of [PO] referral to community agencies for treatment.

"[3]    Provide assistance during office consultation per [PO] request.

"[4]    Assist with the maintenance of records and files.

"[5]    Urine sample collection.

"[6]    Make court appearances when required (subpoena).

"[7]    Obtain [and] enter criminal information using available computer data systems[;] must be LEDS certified.

"[8]    Make collateral contacts via telephone to gather information for [PO].

"[9]    Prepare administrative documents at the direction of [POs] for their utilization in meetings with offenders on their caseload.

"[10]    Make chronological entries at request/direction of the [PO.]"

The memorandum also lists 11 "Prohibited Tasks":

"[1]    Independent home visits.

"[2]    Participation in arrests.

"[3]    Custodial transport.

"[4]    Search and seizure.

"[5]    Preparing offender recommendation independently.

"[6]    Testifying in court on behalf of [PO].[4]

"[7]    Imposing sanctions.

"[8]    Independent supervisory directives to offenders.

"[9]    Reviewing conditions of [p]robation/[p]arole.

"[10]    Accompanying [PO] in the field.

"[11]    Any offender contact (direct or collateral) outside the supervised work environment."

_____

⁴ At first blush, the sixth item in the list of prohibited tasks appears to contradict the sixth item in the list of duties and responsibilities. As we understand the policy, CTs are prohibited from testifying in court on behalf of POs unless they are subpoenaed to testify.

This policy was intended to bring the county into compliance with our decision in *FOPPO*. Plaintiff, however, took the position that the policy still allowed CTs to perform duties that statutorily only POs can perform. After negotiations between plaintiff and the county broke down, plaintiff brought this action, claiming that the county's policy violated ORS 181.653(1).

The central issue, as the trial court framed it, was whether the county's December 1997 policy memorandum permits CTs to perform the duties that ORS 181.653(1) reserves for POs. On that point, plaintiff acknowledged that CTs could perform "clerical" duties but argued that the county's policy allowed CTs to engage in supervision, investigation, and control of offenders in violation of the statute. Plaintiff argued, for example, that, if an offender forgot where he or she was supposed to go for treatment and called *to* ask, the county's policy impermissibly allowed a CT to check an existing record to see where the offender was supposed to go, repeat the information set out in that record, and give the offender the agency's address. In plaintiff's view, that ministerial contact constituted "supervision" within the meaning of the statute, and the statute provides that only POs may supervise offenders. Plaintiff accordingly concluded that some of the duties listed in the county's memorandum violated the statute because they went beyond mere clerical tasks. Plaintiff also argued that, even if the county's policy were valid, the county was not following it.

For the most part, the trial court agreed with plaintiff and ruled that the county's policy set out in the 1997 memorandum violated ORS 181.653(1). In reviewing the tasks listed in the memorandum, the court agreed that the "prohibited tasks" could not be performed by CTs. However, the court concluded that several of the tasks that the memorandum allowed CTs to perform could be performed only by POs. The court explained:

> "Given *FOPPO* and [ORS 181.653(1) and ORS 181.610(14)], this court concludes that several of the listed 'duties and responsibilities' must not be performed by CTs * * *. Accordingly, a declaration will issue that the policy enunciated in the deputy director's memorandum of December 1, 1997, does not comply with the statutes * * *.

"It is the present intention of this court to enjoin the county: (1) from allowing CTs to have any personal contact, either by telephone or in person, whether initiated by the probationer or the CT, with any probationer, unless the in-person contact occurs within the personal presence of the CT's supervising PO; and (2) from making what was referred to in the testimony as 'collateral contacts' (*e.g.*, initiating telephone contact with treating agencies to see if the probationer is performing appropriately)."

The court accordingly enjoined the county from "using [CTs] to perform duties that require or permit them to have personal or telephonic contact with offenders." The court's judgment provides:

"Specifically, and for example, defendant is enjoined from using [CTs] to:

"A.  Monitor compliance with conditions of parole or probation, such as: home visits, searches and seizures, arrests, offender interviews, taking urine analysis samples and collateral contacts with, for example, family members, employers and judges.

"B.  Assign offenders to treatment agencies or programs, social services or housing.

"C.  Impose sanctions.

"D.  Interview offenders to obtain information.

"E.  Issue travel permits.

"F.  Create Action Plans.

"G.  Review and sign conditions of supervision with offenders.

"Defendant may continue to use [CTs] to assist [POs] in their duties, including but not limited to performance of the following administrative tasks at the direction of a [PO]:

"A.  Prepare administrative documents at the direction of the [PO] with information provided by the [PO], for example, revocation requests and warrant requests.

"B.  Prepare administrative documents at the direction of the [PO] with information received from a written work order.

"C.   Issue standardized form letters pursuant to written office procedures.

"D.   Make collateral contacts pursuant to a written work order from the [PO], which specifies who is to be contacted, and the specific information to be obtained. Collateral contacts include, for example, other [POs], treatment programs, police agencies and court staff.

"E.   Make chronological entries documenting incoming mail pursuant to written office procedures.

"F.   Take messages for [POs] from offenders or other persons regarding offenders, either over the telephone or in the office, pursuant to written office procedures.

"G.   Access LEDS and other criminal justice databases pursuant to written office procedures."

The county has appealed from the trial court's judgment. It argues that its policy permits CTs to perform only ministerial, nondiscretionary duties at the direction and under the supervision of POs, that its policy is consistent with the applicable statutes, and that it has adhered to its policy. The arguments that the county raises on appeal divide logically into three related but separate issues. The first is whether the statutes permit a CT to assist POs by performing ministerial tasks involving the supervision, investigation, and control of offenders.[5] If the statutes permit that use of CTs, the second issue is whether the county's 1997 policy is consistent with the applicable statutes. If it is, the final issue is whether the county has failed to adhere to its policy.

On the first issue, plaintiff acknowledges that a CT can perform "clerical" tasks related to supervising or investigating parolees and probationers but argues that CTs cannot perform "ministerial" tasks involving supervision, investigation and the like, even when a CT acts under the direction of

---

[5] The county's policy choice defines the limit of our statutory inquiry; that is, because the county seeks to use CTs only to perform ministerial, nondiscretionary duties, we need not decide whether the statute permits more than that.

a PO. Putting aside the definitional question of how a "clerical" task differs from a "ministerial" one, the more fundamental issue is whether the statute limits the county's authority to structure its workforce in the way that plaintiff perceives. Because plaintiff argues that our decision in *FOPPO* resolves that issue in its favor, we begin with that decision.

In *FOPPO*, we examined Washington County's probation system, which employed both certified POs and uncertified "case monitors." 142 Or App at 254. We first addressed the relationship between ORS chapter 137 and ORS 181.610(13) (1995). *Id.* at 258-60. In Washington County's view, the only employees required to be certified under ORS 181.653 were those who performed the duties of a parole and probation officer as defined in ORS chapter 137. *Id.* The plaintiff countered that, although written in general terms, ORS 181.610(13) (1995) provided the more appropriate source for determining who must be certified—that is, anyone who "performs the duty of community protection by controlling, supervising and providing reformative services for adult parolees and probationers or who performs the duty of investigation of adult offenders on parole or probation." ORS 181.610(13) (1995). We agreed with the plaintiff that the certification requirement in ORS 181.653(1) was not limited to persons who performed the specific functions listed in ORS chapter 137. We reasoned that "[t]he more reasonable interpretation is that when ORS 181.610(13) [1995] and ORS 181.653(1) are read with ORS chapter 137, the latter amplifies the general duties enumerated in the former statutes." *Id.* at 259-60.

Turning to the facts in that case, we found that Washington County's monitors were: (1) providing initial orientation; (2) encouraging and monitoring compliance; (3) investigating reasons for noncompliance; (4) providing crisis assistance; (5) referring offenders to appropriate resources; and (6) issuing travel permits. *FOPPO*, 142 Or App at 260. We concluded that "[a]ll of these functions involved reformative services, control, supervision and investigation of offenders within the meaning of [ORS 181.610(13) (1995)]." *Id.* We declined to decide whether Washington County could use noncertified monitors to assist the POs in performing those tasks because, on the facts of the case, the

monitors were doing more than simply assisting the POs; they were performing all of those functions "without the involvement of a certified officer." *Id.* We accordingly "disagree[d] with the trial court that the case monitors on this record are merely assisting certified officers in the performance of their duties. Rather, the more persuasive evidence demonstrates that the case monitors are performing those functions *in lieu of* certified officers." *Id.* (emphasis added).

■ Given the facts in *FOPPO*, we found it unnecessary to reach the first issue presented here—whether noncertified employees can assist POs as long as they act under their supervision and direction. We turn to that issue now, looking first to the text and context of the statute. *See PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993). As noted above, ORS 181.653(1) requires that persons who are employed as parole and probation officers for more than a year be certified by BPSST. ORS 181.610(14) defines "parole or probation officer" as

> "any officer employed full time by the Department of Corrections, a county or a court who is charged with and actually performs the duty of community protection by controlling, supervising and providing reformative services for adult parolees and probationers, or who performs the duty of investigation of adult offenders on parole or probation or being considered for parole or probation."

Defining the duties that a parole and probation officer performs does not necessarily resolve the question whether a parole and probation officer may use other noncertified persons to help perform those statutorily defined duties. To say, for example, that only licensed attorneys may engage in the practice of law does not mean that attorneys may not use properly supervised paralegals to assist them in providing legal services to their clients. *See State ex rel Oregon State Bar v. Lenske*, 284 Or 23, 31 and n 4, 584 P2d 759 (1978).[6] The same principle applies equally here.

---

[6] In *Lenske*, the court quoted a 1968 opinion from the American Bar Association with apparent approval:

> "A lawyer can employ lay secretaries, lay investigators, lay detectives, lay researchers, accountants, lay scriveners, nonlawyer draftsmen or nonlawyer researchers. In fact, he may employ nonlawyers to do any task for him except counsel clients about law matters, engage directly in the practice of law, appear in court or appear in formal proceedings a part of the judicial process,

In defining a parole and probation officer's duties, ORS 181.610(14) is silent on whether certified officers may use properly supervised assistants to help them perform their job and, in its silence, ambiguous. We accordingly turn to the legislative history. *See PGE*, 317 Or at 611-12. The legislature enacted what are now ORS 181.653 and ORS 181.610(14) in 1977. *See* Or Laws 1977, ch 382, §§ 1 and 9. It was responding to two related but separate concerns. First, too much paperwork was distracting parole and probation officers from supervising criminal offenders. Minutes, House Judiciary Subcommittee, HB 2657, March 28, 1977, pp 12-13 (testimony of Chuck Pfeiffer).[7] Second, new officers received little, if any, specific training for their jobs. *Id.* at 15-16 (testimony of Teresa Carol and Duncan Pierce). Rather, new parole and probation officers received information generally applicable to state employees, with no focus on the particular tasks that they would be called on to perform. *Id.* To remedy the second problem, the legislature provided that BPSST would provide training and certification for persons employed as probation and parole officers.[8] Although establishing certification requirements did not address the legislature's related workload concern, one witness explained that the first priority was to provide adequate training and then address staffing issues. *Id.* at 16 (testimony of Edgar Smith).

The legislative history does not specifically address whether a county may employ properly supervised noncertified employees to assist parole and probation officers in carrying out their statutorily defined tasks. The issue was never raised. The history that does exist, however, persuades us that the county's position is correct. To the extent that the legislature was concerned that paperwork and other ministerial tasks were detracting from the ability of parole and probation officers to perform their proper role, permitting noncertified employees to perform ministerial or preliminary

so long as it is he who takes the work and vouches for it to the client and becomes responsible for it to the client."

284 Or at 31 n 4 (internal quotation marks omitted).

[7] Pfeiffer was the chair of the subcommittee that recommended that parole and probation officers be certified.

[8] The legislature did not specify the content of that training but left it up to BPSST.

tasks under the supervision of parole and probation officers advances the legislature's primary goal. Moreover, as long as a parole and probation officer properly supervises a noncertified employee, then the requisite skill and training will be brought to bear on the issue and the legislature's underlying concern will be satisfied.

Having considered the text, context, and legislative history of the statute, we hold that ORS 181.653 and ORS 181.610(14) do not preclude the county from using CTs to assist POs in investigating, controlling, supervising, and providing reformative services to probationers and parolees. Put another way, the statute does not prevent the county from using noncertified employees to perform ministerial tasks at the direction and under the supervision of certified officers.

■    The second issue is whether the county's 1997 policy is consistent with the statute. In its brief, plaintiff focuses on three of the duties listed in defendant's policy memorandum: (1) "[i]nterview[ing] offenders in office to obtain information as requested by [PO]"; (2) "[p]rovid[ing] assistance during office consultation per [PO] request"; and (3) "[m]ak[ing] collateral contacts via telephone to gather information for [PO]." Plaintiff argues that these duties "run afoul of the statutory mandate" because they involve noncertified employees in the supervision, investigation, or control of offenders. Plaintiff does not explain why these duties, if limited to ministerial tasks, would necessarily be inconsistent with the statute. Rather, plaintiff's argument appears to be based on the proposition that the "statutes, as construed in *FOPPO*, mandate that **all** PO functions, in their entireties, be performed by POs." (Boldface in original.) Plaintiff thus appears to repeat the position that it took below—that, if an offender called because he or she had forgotten which treatment provider had been ordered, the statutes would prohibit a CT from looking at the records and repeating the information already in the records to the offender. As we have already explained, however, the statutes do not reach that far, nor did we interpret them that broadly in *FOPPO*.

The trial court advanced a different rationale for saying that the county's policy violated ORS 181.653. It reasoned that noncertified employees may not have any contact

with offenders unless a PO is present. That rationale sweeps too broadly. Noncertified employees assisting certified officers may be required to come into contact with offenders from time to time, just as a paralegal or legal assistant may come into contact with a client. The question, however, is not whether a noncertified employee has come into contact with an offender, but whether the degree to which noncertified employees come into contact with offenders means that they are acting in lieu of a certified officer. *See FOPPO*, 142 Or App at 260.[9] The mere fact that CTs come into contact with offenders in performing the functions set out in the county's policy does not mean that the policy runs afoul of the statutory certification requirement.

Rather, the county's policy will stay within statutory limits as long as the CTs' assistance in obtaining information, providing assistance, and making collateral contacts is limited to ministerial tasks performed either at the direction of or under the supervision of a PO. Put another way, the statutory definition of parole and probation officers does not prevent noncertified employees from gathering specific data at a certified officer's direction, providing that data to the officer, and allowing the officer to make a discretionary decision based on that data. Properly applied, the county's policy is consistent with the statute.

■       The final question is whether the county is complying with its policy. Plaintiff argues that it is not and asks us to read two portions of the record, which, in its view, demonstrate conclusively that the county has violated its own policy. Having examined the entire record, we are not persuaded by plaintiff's argument. Its argument is based almost exclusively on 18 out of 3,000 to 4,000 files that are part of the county's case bank—its method for supervising limited- and low-risk offenders.[10] Many of the 18 files involve one CT, and,

---

[9] In *FOPPO*, we noted that noncertified case monitors were often the "primary, if not the only, individual with whom the offender will have contact," but the contact itself was not the problem. 142 Or App at 260. Rather, as discussed above, the problem was the complete absence of a certified officer in the process and the fact that noncertified case monitors were not simply assisting certified parole and probation officers. *Id.* Rather, they were acting in lieu of those officers. *Id.*

[10] We note that plaintiff does not appear to challenge the way that POs and CTs work together with the medium- and high-risk offenders.

in those files, plaintiff focuses primarily on the period immediately after the county implemented its December 1997 policy. The county offered contrary evidence explaining how the policy was working throughout the case bank and in other areas of the county's community justice program. Having reviewed the record, we are not persuaded that the county is somehow systematically failing to implement its December 1997 policy. There may well have been some deviations from the policy as the county has attempted to implement it. We are not convinced, however, that plaintiff has established that the county is acting in a way that warrants injunctive relief. *See Burke v. Children's Services Division*, 288 Or 533, 548, 607 P2d 141 (1980) ("[w]e will not assume that the defendant agencies of the State of Oregon will, in the absence of an injunction, refuse to follow the law as we have stated it").[11]

On appeal, reversed and remanded with instructions to declare Multnomah County's December 1997 policy valid and to vacate the injunction; on cross-appeal, affirmed.

---

[11] Given our disposition of the merits of plaintiff's claims, we agree with the trial court that plaintiff is not entitled to attorney fees under *Deras v. Myers*, 272 Or 47, 535 P2d 541 (1975).