Argued and submitted April 4, reversed and remanded June 20, 2012

MARK LATHAM EXCAVATION, INC.,
*Respondent,*

*v.*

DESCHUTES COUNTY,
Eric Hoffman, Ronna Hoffman, Sanders Nye,
and Cascades Academy of Central Oregon,
*Petitioners,*

*and*

OREGON PARKS AND RECREATION DEPARTMENT
and Danielle Nye,
*Intervenors-Respondents below.*

Land Use Board of Appeals
2011078;
A150685 (Control), A150693

281 P3d 644

Laurie E. Craghead argued the cause for petitioners and filed the brief for petitioner Deschutes County. With her on the brief were Paul D. Dewey for petitioners Eric Hoffman and Ronna Hoffman, and Michael H. McGean for petitioners Sanders Nye and Cascades Academy of Central Oregon.

Bruce W. White argued the cause and filed the brief for respondent.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Nakamoto, Judge.

NAKAMOTO, J.

## NAKAMOTO, J.

Deschutes County, Eric and Ronna Hoffman, Sanders Nye, and Cascades Academy of Central Oregon (collectively, respondents) seek judicial review of a final opinion and order of the Land Use Board of Appeals (LUBA), in which LUBA remanded a land use decision of Deschutes County.[1] The county's decision granted petitioner, Mark Latham Excavation, Inc., site plan and conditional use approval to expand an existing mining operation but imposed a condition of approval that prohibited further mining of a headwall[2] until a post-acknowledgement plan amendment is submitted and approved for that use. In remanding, LUBA sustained petitioner's objection to that condition and rejected the county's underlying determinations: that the county's Program to Meet the Goal (PTMG)—a legislative enactment to accomplish statewide land use goals—was ambiguous and that the county would have enacted a different PTMG had it known the headwall on the subject property would be extensively mined, as petitioner plans. For the reasons stated below, we reverse and remand LUBA's decision.

The 80-acre property subject to this dispute is just north of Bend, approximately one mile southwest of Tumalo State Park, and 500 feet west of the Deschutes River. In 1995, the county granted the prior owner of the property, Cascade Pumice, a permit to mine pumice until 2007, when petitioners purchased the property. Petitioners sought a conditional use permit to expand the mining operation to include, among other things, mining 3.4 million cubic yards of tuff and further mining into the side of a prominent hill situated along the south side of the site.

Before we discuss the specifics of the county's decision approving the application, we pause to give a brief overview of the county's Goal 5 planning history, which is pertinent to the county's decision, LUBA's opinion, and the

---

[1] References to parties as petitioner and respondents refer to the designation of the parties in LUBA's proceeding below. *See* ORAP 5.15 ("[P]arties shall not be referred to as appellant and respondent, but as they were designated in the proceedings below.").

[2] Headwall means "a steep slope forming the head of a valley." *Webster's Third New Int'l Dictionary* 1043 (unabridged ed 2002).

parties' arguments. Goal 5 is a statewide planning goal enacted to "protect natural resources and conserve scenic, historic, and open space resources." Goal 5; *see* OAR 660-015-0000(5). As specified in OAR chapter 660, division 16, local governments must conduct three tasks to comply with Goal 5. First, local governments must inventory key resource sites. OAR 660-016-0000. Second, local governments must identify conflicts with the inventoried Goal 5 resource sites and determine the "Economic, Social, Environmental and Energy" (ESEE) consequences of allowing conflicting uses for those sites.[3] OAR 660-016-0005(1). Finally, based on the determination of the ESEE consequences, the local government must develop a "program to achieve the Goal." OAR 660-016-0010. When enacting a "program to achieve the Goal," the local government has three options. It can completely protect the resource, allow conflicting uses fully, or allow the conflicting use but in a limited way so as to protect the resource site. OAR 660-016-0010(1) - (3).

In 1990, the county enacted a series of ordinances to comply with its Goal 5 planning obligation for mineral and aggregate resources. The county enacted Deschutes County Ordinance (DCO) 90-025, which adopted an inventory of significant mineral and aggregate sites, including petitioner's site. The county also enacted DCO 90-029, an ordinance that adopted the "ESEE Findings and Decision" (ESEE decision) for petitioner's site. The ESEE decision addressed each of the three steps required by OAR chapter 660, division 16: an inventory of resources on the site, an analysis of conflicting uses, and the county's program to meet the goal.

As for resources on the site, petitioner's predecessor, Cascade Pumice, represented to the county that less than 25 acres of the site would actually be mined. The ESEE decision for petitioner's site identified 750,000 cubic yards of pumice and 10,000 cubic yards of sand and gravel to be mined, but did not identify tuff, a type of volcanic rock, as a resource. The ESEE decision then identified conflicting uses and discussed the ESEE consequences of the conflicting uses. At the end of the discussion, the county elected to adopt a "Program to

---

[3] A "conflicting use" is one which, if allowed, "could negatively impact a Goal 5 resource site." OAR 660-016-0005(1).

Meet the Goal" under OAR 660-016-0010(3) to limit both the extraction of the resource and the conflicting uses. Pertinent to this appeal is paragraph 23 of the PTMG, which provides:

"The Board finds that in order to protect both the aggregate resource and the conflicting resources and uses, the site * * * will be zoned for surface mining, subject to the following ESEE conditions:

"(a)  Setbacks shall be required for potential conflicting residential and other development;

"(b)  Noise and visual impacts shall be mitigated by buffering and screening, with particular attention paid to screening from Tumalo State Park or the eastern, northeastern and southeastern boundaries;

"(c)  Hours of operation shall be consistent with DEQ standards and applicable county ordinances;

"(d)  Wildlife restrictions set forth in [Oregon Department of Fish and Wildlife]'s letter of August 10, 1989, shall apply;

"(e)  Excavation shall be limited to five acres with ongoing incremental reclamation (subject to [Department of Geology and Mineral Industries] review and approval);

"(f)  Mining operations, including placement of processing operations and equipment and excavation and transport of material shall meet all applicable DEQ noise and dust standards.

"The Board finds that processing on site will be allowed."

Thus, in its PTMG, the county determined that it would apply the surface mining zone to the site. That zone imposes a number of limitations or requirements on mining to reduce off-site impacts, including setbacks, screening, and noise and operational limitations. Other than limiting the excavation site to five acres, the PTMG did not restrict where petitioner could mine, and it did not mention the hillside.

With the above background in mind, we turn to the facts that led up to this judicial review. Petitioner purchased the subject property from Cascade Pumice in 2007 and submitted an application to the county to expand mining operations into the hillside. A portion of the northwestern slope of

the hill has already been mined. The application also sought to mine and export both pumice and tuff. Approval of petitioner's application would ultimately result in a more pronounced headwall, both in height and length. The existing headwall is visible from the Tumalo State Park campground and associated trails.

In 2009, the county granted a conditional use permit that, among other things, allowed petitioner to mine further into the hillside for tuff as incidental to mining for pumice, the inventoried resource. Two of the respondents in this appeal, Eric and Ronna Hoffman, appealed to LUBA. In 2010, LUBA determined that the county did not adequately explain its reasons for allowing the mining of tuff, and remanded the county's decision. *Hoffman v. Deschutes County*, 61 Or LUBA 173 (2010).

In finding that the county's explanation of its decision that tuff was incidental to pumice mining was insufficiently clear, LUBA noted that petitioner sought to mine approximately 3.4 million cubic yards of tuff and only 700,000 cubic yards of pumice. That fact and the lack of an explanation of the potential impact of mining and removing the tuff led LUBA to question whether tuff mining was merely incidental to pumice mining. In addition, LUBA held that when a different, noninventoried mineral resource is later discovered at a subject site, and that resource is not identified in the ESEE analysis as a significant mineral resource, the county can extend Goal 5 protection to that resource by requiring a new ESEE analysis. The county can only require a new ESEE analysis if that noninventoried mineral is not "incidental" to mining an inventoried Goal 5-protected resource. LUBA stated that the test to determine whether mining for a new mineral resource is incidental to mining for the inventoried resource depends on whether the local government would have enacted the same PTMG had the local government known about the new mineral resource at the time the ESEE analysis and PTMG were adopted.

In 2011, on remand from LUBA, the county first determined that mining tuff was not incidental to mining pumice because, had the county known about the volume of

tuff in the headwall in 1990 when it enacted the Goal 5 ordinances, its ESEE decision and PTMG would have been different. As a result, the county determined that an amended ESEE analysis is required to evaluate petitioner's proposed mining of tuff on its site. The county also determined that the county in 1990 would have reached a different conclusion in its PTMG had it analyzed mining of the headwall. The county therefore approved petitioner's application with a condition of approval, Condition 20, which states that "[f]urther mining of the headwall is prohibited unless and until a Post Acknowledgement Plan Amendment is submitted and approved for that use."

Petitioner appealed to LUBA, challenging both the decision that an amended ESEE analysis is required and the imposition of Condition 20. Petitioner argued, among other things, that the PTMG permitted petitioner to mine anywhere on its property, including into the hillside, so Condition 20 was improper, and that, because the PTMG allows petitioner to remove pumice, it can mine tuff as incidental aggregate, without need for an amended ESEE analysis. In its second, 2012 opinion in this case, LUBA affirmed the county's determination that mining of the tuff was not contemplated by the ESEE decision and that a new ESEE analysis would be necessary for petitioner to remove the tuff. However, LUBA rejected the county's determination that its 1990 PTMG would have been different if mining the hillside had been contemplated at that time and rejected the county's imposition of Condition 20.

In sustaining petitioner's challenge to Condition 20, LUBA noted that it was reviewing the county's interpretation of its own land use provision. Thus, LUBA explained, it was required to affirm the county's "plausible" interpretation of its own land use provisions pursuant to ORS 197.829(1)[4]

---

[4] ORS 197.829(1) provides:

"The Land Use Board of Appeals shall affirm a local government's interpretation of its comprehensive plan and land use regulations, unless the board determines that the local government's interpretation:

"(a) Is inconsistent with the express language of the comprehensive plan or land use regulation;

"(b) Is inconsistent with the purpose for the comprehensive plan or land use regulation;

and *Siporen v. City of Medford,* 349 Or 247, 259, 243 P3d 776 (2010) (a local government's interpretation of its own land use regulation or comprehensive plan must be upheld if it is "plausible"). LUBA then recounted the county's reasoning for prohibiting mining of the headwall until a new ESEE analysis can be conducted:

> "The county's findings in support of Condition 20 note that the owner of the property, Cascade Pumice, represented in 1989 that it only intended to mine approximately 25 acres of [petitioner's site]. From that 1989 representation, the county infers that the Goal 5 plan for the property that the county adopted in 1990 anticipated that only the flatter portion of the property in the north was to be mined. * * * The county's findings also point out that the 1990 Conflict Resolution/ESEE Analysis findings (1) refer to 'the opening of a pit in the ground,' (2) refer to mining as a 'transient use,' (3) express concern with dust and visual impacts of mining on nearby Tumalo State Park, the adjacent Deschutes River Scenic Area, and other surrounding properties and (4) make no mention of a highly visible headwall. In imposing Condition 20, the county reasons that opening a pit in the ground has quite different impacts from mining into the side of a hill to create a large headwall that will not be 'transient' and will have significant visual and other impacts on Tumalo State Park, the adjacent Deschutes River Scenic Area, and other surrounding properties. The county reasons that because no headwall was discussed in 1990 Conflict Resolution/ESEE Analysis findings, mining in a way that will produce a large headwall is not authorized by the Goal 5 plan for [petitioner's site]."

*Mark Latham, Inc. v. Deschutes County,* \_\_\_\_ Or LUBA \_\_\_\_ , \_\_\_\_ (LUBA No 2011-078, Jan 17, 2012) (slip op at 10).

LUBA explained that before it could determine the plausibility of the county's interpretation, it first had to determine whether the PTMG categorically prohibited headwall mining. *Id.* at \_\_\_\_ (slip op at 12). LUBA concluded that there was no ambiguity in the PTMG on that issue and that there were no limits on headwall mining in the PTMG:

---

"(c) Is inconsistent with the underlying policy that provides the basis for the comprehensive plan or land use regulation; or

"(d) Is contrary to a state statute, land use goal or rule that the comprehensive plan provision or land use regulation implements."

"The county's findings identify no language in the PTMG text, the ESEE conditions or the [surface mining] zone that can be read to suggest a limitation on mining the side of the hill to create a headwall, or that limits mining to any particular location on the 80-acre parcel zoned [surface mining]. Indeed, that the county zoned the entire 80-acre parcel [surface mining] suggests the contrary.

"That is not to say that under the PTMG that is embodied in the ESEE conditions and the provisions of the [surface mining] zone, the county could not determine that a site plan that proposes to greatly increase the size of the headwall, even if the proposal were to be modified to propose extraction and export of only the inventoried pumice, could not be approved because it runs afoul of one or more of the screening or other standards imposed by the [surface mining] zone or that it fails to confirm with ESEE condition b for [petitioner's site]. * * * However, we have not been able to locate any text in the PTMG that suggests a limitation on mining the site to create or expand a headwall, and on that issue the PTMG seems unambiguous."

*Id.* at _____ (footnote omitted) (slip op at 13). Accordingly, while noting that the county could consider whether petitioner's planned mining would be contrary to existing ESEE conditions or surface mining zoning requirements, LUBA sustained petitioner's objections to the county's complete prohibition of mining of the headwall, and remanded the decision.

Respondents seek judicial review of LUBA's order concerning Condition 20. In a joint brief, respondents contend that LUBA did not give the proper deference due to a local government's plausible interpretation of its own code provisions under *Siporen*. In respondents' view, LUBA inappropriately imposed a restriction on the county's ability to interpret its own enactments by requiring the county to identify language in the PTMG that the county contends is ambiguous. Respondents contend that the ESEE decision and PTMG do not address mining into the hillside at all and that, in the face of language in the ESEE decision, including concerns as to impacts on Tumalo State Park and the Deschutes River Scenic Waterway and a description in the ESEE decision of the mining as "the opening of a pit in the ground," the absence of such an analysis means that such mining into

the hillside was not contemplated—not that such mining was allowed. Petitioner responds that LUBA correctly determined that the county's interpretation was inconsistent with express language of the plan and ordinances because the PTMG and zoning regulations do not expressly restrict mining into the side of a hill or headwall mining, and the county is now creating an ambiguity because it is unhappy with the 1990 ESEE decision that permitted such mining.

We note at the outset that, although petitioner stated at oral argument that its ultimate goal is to mine and export tuff, the only issue on appeal is whether LUBA erred in determining that the county's decision to categorically prohibit, for now, further headwall mining, even for pumice, is correct. Petitioner withdrew its cross-petition for review and does not challenge LUBA's conclusion that the county correctly decided that a new ESEE decision would be required to mine tuff. Thus, whether petitioner can mine for tuff is not at issue on judicial review. Accordingly, we do not decide that issue and focus on Condition 20.

We review LUBA's order to determine whether the order is "unlawful in substance or procedure." ORS 197.850(9)(a). In addressing whether LUBA applied the proper level of deference to the county's interpretation of its land use ordinance, we first determine LUBA's standard of review. Pursuant to ORS 197.829, LUBA shall affirm a local government's interpretation of its own land use regulations if it is "inconsistent with the express language of the comprehensive plan or land use regulation[.]" ORS 197.829(1)(a). Whether a local government's interpretation is "inconsistent with the express language" of its own land use regulations

"depends on whether the interpretation is plausible, given the interpretive principles that ordinarily apply to the construction of ordinances under the rules of *PGE* [*v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993),] as modified by *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009)."

*Setniker v. Polk County*, 244 Or App 618, 633-34, 260 P3d 800, *rev den*, 351 Or 216 (2011) (internal quotation marks omitted; brackets in original) (quoting *Western Land & Cattle, Inc. v. Umatilla County*, 230 Or App 202, 209, 214 P3d

68 (2009)). Under *PGE* and *Gaines*, the purpose of interpreting legislation is to discern the legislative intent. *Gaines*, 346 Or at 171. Legislative intent is interpreted by examining the text, context, and any helpful legislative history. *Id.* at 171-72. Thus, we will reverse LUBA's decision if the county's interpretation of its land use regulations and comprehensive plan is plausible based on the interpretive principles set forth in *PGE* and *Gaines*.

With those general interpretive principles in mind, we turn to the county's interpretation of its Goal 5 regulations. The county found that "[n]either the headwall nor the tuff was mentioned in the ESEE." The ESEE decision includes the PTMG, the regulatory portion of the ESEE analysis. Thus, the county also determined that the PTMG does not mention mining into a headwall. The county then reviewed the ESEE decision and concluded that, "[i]f the height of the headwall and the volume of the tuff proposed to be mined by this applicant had been contemplated by the Board in 1990, the Board would not have chosen to balance conflicts in the same way and with the same Program to Meet the Goal." That is, the county determined that, when it enacted the PTMG, the county did not intend to allow the extensive mining of the headwall that petitioner plans.

Respondents contend that the county is not required to rely simply on the PTMG to interpret its meaning, particularly when the PTMG does not explicitly provide for mining the hillside. They rely on *Siporen*, which provides:

> "[W]hen a local government plausibly interprets its own land use regulations by considering and then choosing between or harmonizing conflicting provisions, that interpretation must be affirmed, as held in *Clark* [*v. Jackson County*, 313 Or 508, 836 P2d 710 (1992)] and provided in ORS 197.829(1)(a), unless the interpretation is inconsistent with *all* of the 'express language' that is relevant to the interpretation or inconsistent with the purposes or policies underpinning the regulations."

349 Or at 259 (emphasis in original). We understand respondents' position to be that the county first reviewed the PTMG and found a competing interpretation because "the PTMG does not explicitly provide for mining the hillside." The

county then reviewed the context for the PTMG: the ESEE decision, legislative history, and underlying policies for the Goal 5 planning for petitioner's site, including protection of Tumalo State Park and the Deschutes River. Respondents conclude that the county is entitled to review the text and context of the ESEE decision to inform its interpretation of the PTMG and the comprehensive plan, especially given silence on the issue of headwall mining.

Petitioner in part responds that the county's interpretation cannot be plausible because the county failed to find an ambiguity in the PTMG, which is the regulatory portion of the ordinance. In petitioner's view, the county found ambiguity in the context or legislative history of the PTMG rather than finding a conflict within the regulation (PTMG) itself. Petitioner also points out that had the county in 1990 intended to expressly exclude headwall mining, it could have done so by stating it as a condition in the PTMG. The lack of detailed information on exactly where and how to mine, according to petitioner, suggests that the PTMG does not preclude headwall mining. Petitioner also provides extrinsic evidence in support of its position. Some ESEE decisions for other mining sites in the county reveal that the ESEE analysis contains more detail regarding the mining operations, *i.e.*, headwall mining, and the county in those ESEE decisions included specific limitations on headwall mining in the PTMG. Moreover, according to petitioner, the PTMG zoned petitioner's site "surface mining," which is defined in DCC 18.04.030 to include "extraction of natural mineral deposits * * * exposed by any method." By interpreting the PTMG and land use regulations to prohibit headwall mining, the county's interpretation would insert new language in the PTMG in violation of ORS 174.010.[5] We disagree both with petitioner's proposed rules of construction and with its suggestion that the county's interpretation is not plausible

---

[5] ORS 174.010 provides:

"In the construction of a statute, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars such construction is, if possible, to be adopted as will give effect to all."

because petitioner's construction of the PTMG is the better one.

First, the standard of review is highly deferential to the county. Although petitioner's interpretation of the PTMG and land use regulations is certainly plausible, the issue remains whether *the county's interpretation* is plausible. The existence of a stronger or more logical interpretation does not render a weaker or less logical interpretation "implausible" under the *Siporen* standard. *Siegert v. Crook County*, 246 Or App 500, 509, 266 P3d 170 (2011). Petitioner's argument that its interpretation of the PTMG makes sense and is better than the county's interpretation cannot alone carry the day.

Second, for several reasons, we reject petitioner's contentions that the county (1) must find an ambiguity by pointing to specific language in the PTMG susceptible to different meanings and (2) must consider the ambiguity by looking only at the language of the PTMG, as opposed to considering the ESEE decision to conclude that further mining into the hillside was not permitted. Here, the dispute does not center on the meaning of a particular term or phrase. Rather, the dispute concerns whether silence—the absence of any mention or analysis of mining into the hillside and the creation of a large headwall—indicates that such mining was permitted or instead simply was not contemplated. Reviewing the PTMG, it is undisputed that there is no *express language* that either allows or prohibits mining of the headwall. Thus, petitioner's contention that the county must point to an ambiguous term in a portion of the PTMG is unavailing in this kind of dispute. *See, e.g., Multnomah Cty. Employees Union v. Multnomah Cty.*, 176 Or App 323, 333, 31 P3d 499 (2001) (finding ambiguity in a statute defining an officer's duties that was silent as to whether officers may use assistants to perform job duties); *State v. Plankinton*, 62 Or App 554, 557, 661 P2d 1387 (1983), *rev den*, 295 Or 297 (determining that the silence of a statute concerning territorial limitation on judicial power to issue search warrants created an ambiguity).[6] In addition, the Supreme Court stated in *Gaines*

---

[6] Neither party cites *Multnomah Cty. Employees Union* or *Plankinton*. Also, the parties do not cite *Foland v. Jackson County*, 215 Or App 157, 164, 168 P3d 1238, *rev den*, 343 Or 690 (2007), a case in which this court upheld LUBA's decision that the county misconstrued its ordinance setting forth a three-year deadline for

that, to determine the intent of the lawmakers, it is appropriate to consider legislative history. 346 Or at 172. "Legislative history may be used to confirm seemingly plain meaning * * * [or] to attempt to convince a court that superficially clear language actually is not so plain at all—that is, that there is a kind of latent ambiguity in the statute." 346 Or at 172. The county appropriately examined the ESEE decision to determine whether in 1990, the county contemplated or intended to allow extensive mining of the headwall.

The county gave several reasons for why it concluded from its review of the ESEE decision that headwall mining is prohibited. First, the county noted that the ESEE decision refers to mining as "opening of a pit in the ground," and did not mention any type of mining into a hill or headwall. That silence suggested to the county that the ESEE decision did not contemplate and the PTMG did not permit headwall mining without conducting a new ESEE analysis. Second, the ESEE decision describes mining as a "transient use" that would allow future uses to occur after the mining was complete. Creation of a headwall is not the type of mining that would be a transient use. Third, the ESEE decision specifically addresses concerns about visual and dust impacts on Tumalo State Park, the Deschutes River Scenic Area, and other surrounding uses. The county reasoned that, because there was no headwall mentioned in the ESEE decision, mining in that manner would not be authorized because it would clearly conflict with the visual and dust concerns. Those portions of the ESEE suggest that the county did not contemplate mining of the headwall.

Petitioner makes several arguments as to why the county's interpretation is not plausible.[7] First, petitioner

---

submitting a final development plan. In that case, the property owner argued that the absence of language in the ordinance about the effect of appeals to LUBA on deadlines created an ambiguity. We disagreed, noting that the property owner did not identify a reasonable alternative construction of the ordinance concerning the three-year deadline. 215 Or App at 164. This case is distinguishable from *Foland* because the ordinance in *Foland* expressly addressed a three-year deadline. Here, the PTMG for petitioner's site does not address the headwall or headwall mining at petitioner's site, and respondents have offered an alternative construction grounded in the ESEE decision.

[7] We do not understand petitioner to be arguing that the county's interpretation is inconsistent with the purpose and the underlying policy that provides the basis for the comprehensive plan and is contrary to the land use goals or rules in

argues that the county's interpretation conflicts with OAR 660-016-0010(3), which provides that a county's PTMG should be "specific enough so that affected property owners are able to determine what uses and activities are allowed, not allowed, or allowed conditionally and under what clear and objective conditions or standards." OAR 660-016-0010(3). In petitioner's view, the county's interpretation uses the ESEE decision "to create apparent ambiguity in PTMG language that is clear on its face[.]" We disagree with the premise of petitioner's argument; the PTMG is not, as petitioner asserts, clear on its face concerning whether mining of the headwall in the way it plans is allowed. The PTMG does not explicitly allow or prohibit headwall mining. The county did not "create ambiguity"; rather, the county determined that the ESEE decision, including the PTMG, did not mention a headwall or mining of the headwall. That "silence creates an ambiguity." *Plankinton*, 62 Or App at 557; *see also Multnomah Cty. Employees Union*, 176 Or App at 333 (statute, "in its silence," was ambiguous).

Petitioner also contends that the county's interpretation is implausible because it runs counter to the purpose of OAR 660-016-0010(3). That rule allows a local government to choose between three options after the local government conducts an ESEE consequences analysis. The local government can completely protect the resource, allow conflicting uses fully, or balance the resource protection with the conflicting uses. The county chose the last option, to balance the resource and conflicting uses, in its PTMG. According to petitioner, the county's interpretation is inconsistent with balancing the resources and conflicting uses required by the PTMG and OAR 660-016-0010(3) because it categorically prohibits mining. We disagree. The county's interpretation does not completely foreclose mining of a headwall. Rather, it bars mining the headwall until a new ESEE analysis and consequences and post-acknowledgment plan amendment

---

violation of ORS 197.829(1)(b) to (d), although petitioner mentions those provisions. In any event, such an argument is not properly before us. Our review is limited to whether LUBA's decision is "unlawful in substance," ORS 197.850(9)(a), and LUBA did not determine that the county's interpretation is inconsistent with subsections (b) through (d). Rather, LUBA held that the county's interpretation is inconsistent with ORS 197.829(1)(a) and the *Siporen* standard. Accordingly, the parties and we address that determination.

can be completed. Moreover, the county's interpretation does not "categorically prohibit mining" because it allows petitioner to mine in other areas of its property—areas addressed in the ESEE decision that the county had determined in 1990 can be balanced with the conflicting uses by mitigating conditions.

Petitioner also argues that the county's interpretation is not plausible because it requires local governments to have a "fully articulated" analysis within the ESEE conflicts and consequences analysis, contrary to what the courts have held is sufficient for a local government when conducting a Goal 5 ESEE analysis. Petitioner relies on *Columbia Steel Castings Co. v. City of Portland*, 314 Or 424, 432, 840 P2d 71 (1992), and *Callison v. LCDC*, 145 Or App 277, 283-84, 929 P2d 1061 (1996), *rev den*, 325 Or 403 (1997), for the proposition that an ESEE analysis does not require a "fully articulated" analysis of the interaction between conflicting uses and Goal 5 resources for each specific resource location. In petitioner's view, when the county conducted its ESEE analysis in 1990, it was not required to have a "fully articulated" analysis, and the county's decision to require a new ESEE analysis as a condition of mining into the headwall somehow violates that rule. Petitioner misunderstands the county's decision. The county did not require its 1990 ESEE analysis to be "fully articulated" in a way that is unnecessary, but rather concluded that the county in 1990 never considered whether the headwall would be mined and that, because the PTMG requires balancing of both the protected resource (pumice) and the conflicting uses (scenic views from Tumalo State Park), the county could not allow mining of the headwall until a new ESEE analysis is completed so it can understand the scope and extent of the conflicts and consequences of allowing headwall mining.

If anything, *Columbia Steel* provides support for the county's interpretation. *Columbia Steel* held that when a county makes a decision concerning Goal 5, the reasons it articulates must have existed at the time the PTMG was adopted. 314 Or at 432. The reasons cannot exist if the local government's ESEE analysis never contemplated the effects of a particular resource with conflicting uses. *Id.* Here, the county reviewed its ESEE decision and determined that

the county in 1990 never considered headwall mining. Accordingly, the county decided that a new ESEE analysis would be required before petitioner can further mine the headwall. Therefore, we cannot say that the county's interpretation of the PTMG to prohibit headwall mining is not plausible.

Reversed and remanded.