Argued and submitted July 28, 2014, on petition, reversed and remanded; on cross-petition, affirmed June 10, 2015

DELTA PROPERTY COMPANY, LLC,
*Respondent*
*Cross-Petitioner,*

*v.*

LANE COUNTY,
*Petitioner*
*Cross-Respondent,*

*and*

Joel NARVA
and Teresa Narva,
*Petitioners.*

Land Use Board of Appeals
2013061; A156973

352 P3d 86

Zack P. Mittge argued the cause for petitioners Joel and Teresa Narva. With him on the joint briefs was Hutchinson, Cox, Coons, Orr & Sherlock, P.C.; and Stephen L. Vorhes and H. Andrew Clark for petitioner - cross-respondent.

Stephen L. Vorhes argued the cause for petitioner - cross-respondent.

Bill Kloos filed the brief for respondent - cross-petitioner.

Lauren A. King, Joseph J. Leahy, Leahy, Van Vactor, Cox & Melendy, Edward J. Sullivan, Carrie A. Richter, and Garvey Schubert Barer filed the brief *amici curiae* for City of Springfield and Springfield Utility Board. On the answering brief *amici curiae* for City of Eugene, City of Springfield, and Springfield Utility Board, were Anne C. Davis, Lauren A. King, and Leahy, Van Vactor, Cox & Melendy.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.

NAKAMOTO, J.

## NAKAMOTO, J.

This land use dispute concerns the proposed expansion of Delta Property Company, LLC's (Delta) aggregate and gravel mining operation located in rural Lane County near the City of Eugene. The case is before us on cross-petitions for judicial review of a final order of the Land Use Board of Appeals (LUBA). LUBA affirmed Lane County's (the county) denial of Delta's application for a special use permit for the mining expansion. The county had concluded that, under Lane Code (LC) 16.212(4)(y)(ii), it could not issue a permit unless Delta's mining expansion site was listed on the county's inventory of significant aggregate resources within the acknowledged Lane County Rural Comprehensive Plan (Rural Plan or RCP). Indisputably, the site was not on the county's inventory. In affirming, LUBA deferred to the county's reading of its own ordinance.

LUBA also decided an additional issue, in case we were to reverse as to the challenged interpretation of the county's ordinance. LUBA determined, contrary to the county's decision, that Delta's land is on a certain type of Goal 5 inventory of significant aggregate resources in the Metropolitan Area General Plan (Metro Plan). The Metro Plan is an acknowledged comprehensive plan for the greater Eugene-Springfield metropolitan area, including the cities of Springfield and Eugene and part of Lane County. Delta's proposed expansion site lies within the Metro Plan territory, not the Rural Plan territory.

In their petition for judicial review, the county and local landowners Joel and Teresa Narva (intervenors), who intervened on behalf of the county before LUBA, contend that LUBA's determination regarding the Metro Plan inventory was wrong and will have lasting adverse effects on future land use decisions. In its cross-petition for judicial review, Delta challenges the denial of its special use permit. Specifically, Delta contends that LUBA erred when it accepted the county's proffered interpretation of its ordinance, contending that the interpretation is implausible given that Delta's expansion site is located within the Metro Plan territory and therefore would not and could not have

been included in the Rural Plan inventory, irrespective of its worth as an aggregate resource.

We review LUBA's order to determine whether it is "unlawful in substance," ORS 197.850(9)(a), and whether the order is "supported by substantial evidence in the whole record as to facts found by the board," ORS 197.850(9)(c). We affirm LUBA's determination that one of the county's interpretations of LC 16.212(4)(y)(ii) was plausible and entitled to deference under ORS 197.829(1). But we reverse that part of LUBA's order addressing Delta's first assignment of error to the county's decision concerning the nature of the Metro Plan inventory and the presence of Delta's mining expansion site on that inventory. Therefore, we affirm LUBA's decision in part, reverse in part, and remand.

## I. BACKGROUND

We begin by providing the legal context for the dispute, including the history of Goal 5 given the age of the aggregate resource inventories and acknowledged comprehensive plans at issue. We then generally describe the procedural history of the county's denial of Delta's application and the appeal to LUBA. We later augment our discussion of the facts as necessary to address the parties' contentions, taking the facts from LUBA's opinion and order.

A. *Statewide planning goals and acknowledged comprehensive plans*

In 1973, Oregon adopted its statewide land use planning program. To establish and implement statewide policies, the legislature created the Land Conservation and Development Commission (LCDC). ORS 197.030(1); ORS 197.040(1)(c)(A). LCDC implements statewide policies through the adoption of land use planning standards, or goals. ORS 197.040(1)(c)(A); ORS 197.225; ORS 197.015(8). Those statewide planning goals are mandatory and binding on local governments. ORS 197.015(8).

Local governments are required to adopt comprehensive plans that comply with the statewide goals and must submit those plans to LCDC for review. ORS 197.175(2)(a). A "comprehensive plan" is defined as

"a generalized, coordinated land use map and policy statement of the governing body of a local government that interrelates all functional and natural systems and activities relating to the use of lands, including but not limited to sewer and water systems, transportation systems, educational facilities, recreational facilities, and natural resources and air and water quality management programs."

ORS 197.015(5). If LCDC concludes that the comprehensive plan complies with the statewide goals, it acknowledges the plan, which then allows the local government to make land use decisions under that plan. ORS 197.175(2)(d); ORS 197.225; ORS 197.015(1) (defining "acknowledgment"). Both the Rural Plan and the Metro Plan are acknowledged comprehensive plans.

B.  *Goal 5 inventories*

The statewide goal at issue in this case, Goal 5, was "enacted to 'protect natural resources and conserve scenic, historic, and open space resources.'" *Mark Latham Excavation, Inc. v. Deschutes County*, 250 Or App 543, 546, 281 P3d 644 (2012) (quoting Goal 5). Goal 5 requires local governments to adopt comprehensive plans and land use regulations to inventory and to protect certain resources, including, as relevant here, "mineral and aggregate resources." Goal 5.

At the time that the comprehensive plans at issue in this case—the Metro Plan and the Rural Plan—were acknowledged at various points in the early to mid-1980s, Goal 5 provided, in part, as follows:

"**GOAL:   To conserve open space and protect natural and scenic resources.**

"Programs shall be provided that will: (1) insure open space, (2) protect scenic and historic areas and natural resources for future generations, and (3) promote healthy and visually attractive environments in harmony with the natural landscape character. *The location, quality and quantity of the following resources shall be inventoried:*

"* * * * *

"**b.   Mineral and aggregate resources;**

"* * * * *

"Where no conflicting uses for such resources have been identified, such resources shall be managed so as to preserve their original character. Where conflicting uses have been identified[,] the economic, social, environmental and energy consequences of the conflicting uses shall be determined and programs developed to achieve the goal."

(Emphasis added; some boldface omitted.) Since LCDC's adoption of Goal 5 in 1974, LCDC's administrative rules have added significantly to the requirements and acknowledgment procedures for the Goal 5 planning process. The rule that concerns the dispute over the aggregate resource inventories in this case is LCDC's first Goal 5 rule, which became effective in final form on June 29, 1981, and which was set out in OAR 660-16-000.[1]

Once the first Goal 5 rule became effective, it applied to local governments to varying degrees, depending on the status of their comprehensive plans. Under OAR 660-16-000(6), jurisdictions that had not yet submitted a comprehensive plan to LCDC, that were under plan acknowledgment denial orders from LCDC as of the date of the adoption of the Goal 5 rule, or that were not scheduled for review by the June 1981 LCDC meeting, were fully subject to the Goal 5 rule. For those jurisdictions, LCDC would require compliance with the Goal 5 rule before acknowledging a proposed comprehensive plan. *Id.*

However, for jurisdictions that were under continuance orders, interested parties were given notice and 45 days in which to object to the proposed comprehensive plan based on the first Goal 5 rule. The first Goal 5 rule was then "applied based on objections alleging violations of specific provisions of the rule on specific resource sites." *Id.* If, however, no objections were filed, or objections were insufficiently specific, LCDC would review the plan "against Goal 5 standards as they existed prior to adoption of OAR 660-16-000." *Id.*

---

[1] Our references to the first Goal 5 rule in this opinion are to OAR 660-16-000 (1981). Two other sets of Goal 5 rules are located in the Oregon Administrative Rules. The amended first Goal 5 rule is currently set out in OAR 660-016-0000 to 660-016-0030. LCDC later adopted a second set of Goal 5 rules in 1996, set out in OAR chapter 660, division 23.

Among other things, the first Goal 5 rule fleshed out the requirements for the inventory mentioned in Goal 5. Under the rule, the inventory process was to begin with the local government collecting "available data from as many sources as possible," and then, with that data, the local government was required to determine whether it had "sufficient information on the location, quality and quantity of each resource site to properly complete the Goal 5 process." OAR 660-16-000(1). Based on sufficient data, the local government was to then determine "which resource sites are of significance" and to place "those sites on the final plan inventory." *Id.*

Section (1) of the first Goal 5 rule also instructed that, "[b]ased on data collected, analyzed and refined by the local government," the local government had three options with respect to any resource site:

"(1A)    Do Not Include on Inventory

"Based on information that is available on location, quality and quantity, the local government might determine that a particular resource site is not important enough to warrant inclusion on the plan inventory, or is not required to be included in the inventory based on the specific Goal standards. No further action need be taken with regard to these sites. The local government is not required to justify in its comprehensive plan a decision not to include a particular site in the plan inventory unless challenged by the Department, objectors or the Commission based upon contradictory information.

"(1B)    Delay Goal 5 Process

"When some information is available, indicating the possible existence of a resource site, but that information is not adequate to identify with particularity the location, quality and quantity of the resource site, the local government should only include the site on the comprehensive plan inventory as a special category. The local government must express its intent relative to the resource site through a plan policy to address that resource site and proceed through the Goal 5 process in the future. The plan should include a time-frame for this review. Special implementing measures are not appropriate or required for Goal 5 compliance purposes until adequate information is available

to enable further review and adoption of such measures. The statement in the plan commits the local government to address the resource site through the Goal 5 process in the post-acknowledgment period. Such future actions could require a plan amendment.

"(1C)   Include on Plan Inventory

"When information is available on location, quality and quantity, and the local government has determined a site to be significant or important as a result of the data collection and analysis process, the local government must include the site on its plan inventory and indicate the location, quality and quantity of the resource site ***. Items included on this inventory must proceed through the remainder of the Goal 5 process."

OAR 660-16-000(1) (underscore in original). Thus, under the first Goal 5 rule, a local government was required to identify a site as "significant or important" before including it on the government's comprehensive plan inventory. Section 1 of the first Goal 5 rule reiterates that a "valid" inventory of a Goal 5 resource under subsection 1C of the first Goal 5 rule "must include a determination of the location, quality, and quantity of each of the resource sites." OAR 660-16-000(1).

In contrast, the text of Goal 5 as it existed at the time the first Goal 5 rule was adopted did not require a local government to identify a site as "significant or important" before it was placed in an inventory. That difference matters to a proper understanding of the aggregate resource inventories in the Metro Plan and the Rural Plan ultimately acknowledged by LCDC.

C.   *LCDC's acknowledgments of the Metro Plan and the Rural Plan*

The Metro Plan includes areas inside the urban growth boundary for Springfield and Eugene and a portion of rural areas in Lane County adjoining but outside the urban growth boundary. Adopting the terminology of the parties and LUBA, we refer to the ring of territory that is outside the urban growth boundary and covered by the Metro Plan as "the donut." The Rural Plan covers rural land in Lane County outside the donut.

The Rural Plan and the Metro Plan each contain separate inventories of aggregate resources within their respective territories. The county and the three Metro Plan Jurisdictions—Springfield, Eugene, and the county—had engaged in significant preparatory work and had developed and submitted their inventories to LCDC as parts of their respective comprehensive plans before the first Goal 5 rule went into effect in 1981. Thus, the aggregate resource inventories were initially developed in light of Goal 5's general requirements, not the more specific requirements for inventories in the first Goal 5 rule.

The first Goal 5 rule applied fully to the county's Rural Plan, because LCDC had denied acknowledgment of the Rural Plan in March 1981. That was not the case for the Metro Plan. LCDC applied the more general Goal 5 standards to the Metro Plan, except for resource sites as to which LCDC had received specific objections. Because there were limited site-specific objections, LCDC for the most part applied the Goal 5 standard in reviewing the proposed Metro Plan and applied the first Goal 5 rule in only limited areas as it determined whether the proposed Metro Plan complied with Goal 5.

Both the county and the Metro Plan jurisdictions revised their comprehensive plans over a course of years before obtaining LCDC's acknowledgment. The Metro Plan jurisdictions first adopted and submitted versions of the Metro Plan for LCDC acknowledgment in 1980. LCDC acknowledged the Metro Plan in two parts. Following a continuance order, the Metro Plan was revised and updated in early 1982, and LCDC acknowledged the part of the Metro Plan that applied within the urban growth boundary in August 1982. However, the Metro Plan as it applied to the donut was segmented, and LCDC continued acknowledgment for the donut area to allow the Metro Plan jurisdictions to correct deficiencies under a number of goals, including Goal 5. In 1984, the county again sought acknowledgment of its Rural Plan, but LCDC continued acknowledgment so that the county could work on, among other things, its Goal 5 compliance. Ultimately, LCDC acknowledged the Goal 5 portions of the Rural Plan and the entirety of the Metro Plan, that is, the part concerning the donut, in 1985.

We later describe in detail the review and acknowledgment process by LCDC, primarily as it relates to the Metro Plan's compliance with Goal 5, when we reach petitioners' challenge to LUBA's order.

### D. *Delta's application for a permit to expand its mining operation*

Delta's property is located west of Interstate 5, outside the urban growth boundary near Eugene, and within the Metro Plan donut. Although the Metro Plan applies to Delta's land, the Lane County Land Use and Development Code, LC chapter 16, applies to the proposed development of the property.

Part of Delta's land is now devoted to aggregate and gravel mining and is zoned Sand and Gravel (SG) by the county. The proposed expansion area is approximately 70 acres and lies west of Delta's current operation. That expansion site is zoned as exclusive farm use (EFU) by the county.[2]

Pursuant to ORS 215.213(2), counties that have adopted "marginal lands" provisions, such as the county, may establish any of the enumerated special uses in areas zoned EFU if certain standards in ORS 215.296(1)[3] are met. One of those special uses is "[m]ining, crushing or stockpiling of aggregate and other mineral and other subsurface resources subject to ORS 215.298." ORS 215.213(2)(d)(B). In turn, ORS 215.298(2) provides that a county may issue a permit for mining of aggregate on EFU-zoned land only if the proposed mining site is "a site included on *an inventory in an acknowledged comprehensive plan*." (Emphasis added.) Thus, by statute, the county has the authority to

---

[2] This case involves Delta's second effort to gain the ability to expand its mining operation to its adjoining property. None of the parties contends on review that what occurred during Delta's first effort precludes Delta and other parties, particularly the county, from asserting their various legal positions in this case.

[3] ORS 215.296(1) provides:

"A use allowed under ORS 215.213(2) or (11) or 215.283(2) or (4) may be approved only where the local governing body or its designee finds that the use will not:

"(a) Force a significant change in accepted farm or forest practices on surrounding lands devoted to farm or forest use; or

"(b) Significantly increase the cost of accepted farm or forest practices on surrounding lands devoted to farm or forest use."

allow aggregate mining on land zoned EFU when the proposed mining site is on "an inventory in an acknowledged comprehensive plan."

The county's provision in its land use code concerning special uses for EFU-zoned land is LC 16.212. The prerequisites for issuance of a special use permit specifically for the kind of mining operations that Delta proposed for its expansion site are contained in LC 16.212(4)(y). In relevant part, that provision states that the following aggregate mining use is allowed for EFU-zoned land:

> "Operations conducted for mining more than 1,000 cubic yards of material or excavation preparatory to mining of a surface area more than one acre, crushing and stockpiling of aggregate and other mineral and other subsurface resources that comply with these requirements:
>
> "* * * * *
>
> "(ii) The site for the mining of aggregate must be included on an inventory *in the acknowledged Lane County Rural Comprehensive Plan*; and
>
> "(iii) LC 16.212(10)(f) through (g) below."

LC 16.212(4)(y) (emphasis added). Thus, the county's code differs from the text of ORS 215.298(2) by allowing aggregate mining on EFU-zoned land only when the proposed mining site is on the county's inventory, not "an inventory." It is undisputed that Delta's land is not on Lane County's inventory of aggregate resources in the Rural Plan.

Nevertheless, in its application for the special use permit, Delta took the position that its land was on "the Metro Plan's acknowledged Goal 5 inventory for significant sand and gravel resources" and that the land was therefore in "*an* acknowledged comprehensive plan" (emphasis added) as required by ORS 215.298(2). Delta observed that its expansion site was within the Metro Plan's territory and that the Metro Plan had been acknowledged by LCDC in 1985. Delta argued that LCDC had acknowledged a 1C inventory, that is, aggregate sites that the Metro Plan governments already had considered in conjunction with conflicting uses, as required by the first Goal 5 rule. Delta

argued to the county that, because its site was listed on the only relevant inventory of significant aggregate resources— the Metro Plan inventory—the county had to approve its mining permit even though the county's inventory did not include Delta's land. Delta also contended that LC 16.212(4) (y)(ii) was a part of the county's Rural Plan and that its policies could not apply to the proposed expansion site, which is located within the area covered by the Metro Plan.

A county hearings official first heard the dispute. LUBA explained the rulings by the hearings official as follows:

"The county hearings official found that the proposed expansion area is not included on the Metro Plan [inventory]. The county hearings official also found that the application could not be approved because the proposed expansion area is not on the *county's* inventory of significant aggregate resource sites, rejecting Delta's contention that only the Metro Plan [inventory] applies in the Metro Plan donut area under ORS 215.298(2), and that LC 16.212(4)(y)(ii) cannot be applied to require that Delta's proposed expansion site be on the Lane County RCP inventory, which, as explained above, does not apply in the Metro Plan donut area. Finally, the hearings official found that the application could not be approved because Delta failed to carry its burden under ORS 215.296(1) to establish that mining on the proposed expansion area will neither force a significant change in accepted farm practices nor significantly increase the cost of accepted farm practices."

(Emphasis in original.)

The county's Board of County Commissioners affirmed those rulings and adopted the hearings official's legal interpretations:

"The Board affirms and adopts the Hearings Official decision * * * as the County's final decision * * * and expressly agrees with and adopts the interpretation of the Eugene-Springfield Metropolitan Area General Plan policies and implementing ordinances made by the Hearings Official in the decision."

Thus, the county ultimately determined that Delta's land had to be on the county's inventory in the Rural Plan to

qualify for a special use permit. The county denied the permit to expand the mining operation.[4]

E.  *The LUBA appeal*

Delta appealed the county's decision to LUBA, and intervenors intervened on behalf of the county. The conundrum that LUBA confronted, and that is now presented to us, is that (1) Delta's property lies within the geographic area that is covered by the Metro Plan and, at the same time, is subject to the county's land use code; (2) the county's permit denial was based on the absence of Delta's property from the county's inventory of significant aggregate resources in its Rural Plan, even though Delta's land is not within the geographic area covered by the Rural Plan and not subject to possible inventory by the county; and (3) the county was one of the governments that adopted the Metro Plan and its inventory of aggregate resource sites, which includes Delta's land.

Before LUBA, Delta asserted in its second assignment of error that, because Delta's land does not lie within the area covered by the Rural Plan, LC 16.212(4)(y)(ii) could not be interpreted to require that Delta's land be listed on the county's inventory of significant aggregate resources before Delta could qualify for a special use permit. Instead, according to Delta, the only plausible interpretation of LC 16.212(4)(y)(ii) is that the county intended to allow special use permits for aggregate resource sites listed on either the county's inventory (for areas covered by the Rural Plan) or the Metro Plan's inventory (for areas covered by that plan).

Delta offered a number of rationales for its reading of the county's land use provision. First, Delta argued (and LUBA agreed) that, viewed in context, LC 16.212(4)(y)(ii) is ambiguous. That context includes the following facts: the county's own inventory applies to and includes land situated

---

[4] The county also concluded that Delta's application failed to establish that its proposed mining site would meet the standards in ORS 215.296(1) and LC 16.212(4)(y)(iii), relating to effects on farming practices, when it denied Delta's application for a special use permit. On review, the county and intervenors do not challenge LUBA's adverse decision concerning potential effects of the mining expansion on farming practices under that provision. Accordingly, we address only whether the county properly denied Delta's special use permit based on Delta's failure to meet the requirement in LC 16.212(4)(y)(ii).

only in rural Lane County outside the Metro Plan territory; the county adopted the Metro Plan's inventory; and the county is solely responsible for adopting land use regulations that implement the Metro Plan in the donut outside the urban growth boundary. LUBA concluded that there was no "legislative history suggesting the county intended to require that proposed sites in the donut be included on the inapplicable Lane County RCP inventory of significant mineral and aggregate sites[.]" Second, Delta further contended that ORS 215.298(2) supplied the applicable standard in lieu of an applicable local land use provision and, therefore, that its expansion site was on "an inventory" in the Metro Plan. Delta also contended that, if LC 16.212(4)(y)(ii) could be applied to its land in the Metro Plan donut, the plausible reading of the provision was that "an inventory" in the Rural Plan referred to the Metro Plan inventory.

LUBA, however, concluded that the county had plausibly construed LC 16.212(4)(y)(ii) to require that Delta's land be included on the Rural Plan inventory for a special use permit to issue. Giving deference to the county's interpretation of its code provision under *Siporen v. City of Medford*, 349 Or 247, 243 P3d 776 (2010), and ORS 197.829(1), and with the absence of Delta's land from the county's inventory of significant aggregate sites in its Rural Plan, LUBA affirmed the county's denial of Delta's application. In its cross-petition for judicial review, Delta challenges that decision.

As noted at the outset, LUBA also decided Delta's other two assignments of error. One is relevant to our review: Delta's first assignment of error to the county's determination, after Delta argued that the Metro Plan inventory mattered, that the proposed mining expansion site was not included on a Goal 5 inventory of aggregate resources in the Metro Plan. LUBA agreed with Delta that the county's determination was incorrect. LUBA concluded that the Metro Plan inventory that lists Delta's land is a 1C inventory of significant aggregate resources, that is, one in which the Metro governments had evaluated conflicting uses, as described in the first Goal 5 rule. In summary, LUBA concluded that Delta's assignment of error was well-taken because of its determinations that the documents containing the Goal 5 inventories were ambiguous and that certain

LCDC documents indicated that LCDC had understood that it was acknowledging a Metro Plan with a Goal 5, 1C inventory of aggregate resources.

LUBA acknowledged that its determination of Delta's first assignment of error was not necessary to affirm the county's denial of Delta's special use permit application, explaining:

> "This is a complicated case. We ultimately sustain the first and [third] assignments of error and deny the second assignment of error, with the result that Delta's challenge to two of the county's bases for denial are sustained, but one is rejected. The challenged decision is a decision that denies permit approval, and therefore only requires one valid basis for the denial to be sustained on appeal. *McCoy v. Marion County,* 16 Or LUBA 284, 286 (1987); *Weyerhauser v. Lane County,* 7 Or LUBA 42, 46 (1982). Because we [] deny the second assignment of error, the county's decision must be affirmed, even though we sustain the first and [third] assignments of error. However, the second assignment of error presents a fairly novel issue of law, and the parties have granted a number of extensions to the statutory deadline for LUBA to issue its opinion in this appeal as we have worked our way through the complicated issues presented in the first assignment of error. We therefore decide all issues presented in the first through third assignments of error so that the parties will have a complete resolution of those assignments of error by LUBA in the event our resolution of the second assignment of error is reversed on appeal."

However, the county and intervenors petitioned for judicial review of LUBA's determination of Delta's first assignment of error concerning the Metro Plan inventory of lands with significant aggregate resources, asserting that LUBA's determination will affect future land use decisions of import in the Metro Plan territory. They are supported on judicial review by *amici curiae* City of Springfield and the Springfield Utility Board.

## II.   DELTA'S CROSS-PETITION FOR REVIEW

We begin with Delta's challenge to LUBA's order sustaining the county's denial of Delta's application for a special use permit, because it presents the threshold issue.

As noted above, LUBA deferred to the county's interpretation of LC 16.212(4)(y)(ii) after concluding that the county had proffered two interpretations that were plausible.

LUBA explained that one of those interpretations was based on the potential future incorporation of the Metro Plan inventory of aggregate resources into the Lane County RCP inventory:

> "First, the county suggests that although the Metro [inventory] is authoritative in the donut as far as Goal 5 is concerned, LC 16.212(4)(y)(ii) can be interpreted to require that the Lane County RCP inventory of significant mineral and aggregate sites be amended to incorporate or reflect the [Metro] inventory * * * for the donut area. While that skates pretty close to the plausibility line, it does not cross it. And in view of the confusion regarding the identity of the Metro Plan [inventory], we certainly cannot say there would be no practical purpose in imposing such a parallel shadow inventory requirement to make it easier to administer the county's EFU zone in the donut."

(Emphasis omitted.) LUBA also accepted an interpretation based on the county's exercise of its discretion to restrict uses in the EFU zones within the county:

> "The county also suggests that the requirement in LC 16.212(4)(y)(ii) might represent an exercise of the county's authority to regulate more stringently in the EFU zone than the minimum standards that are set by the statute. Under ORS 215.296(10), the county may impose additional conditions on uses that are authorized by ORS 215.213(2). *Brentmar v. Jackson County*, 321 Or 481, 496, 900 P2d 1030 (1995) ('a county may enact and apply legislative criteria of its own that supplement those found in ORS 215.213(2) and 215.283(2)'). The challenged decision suggests a county decision to regulate mining in the donut more stringently than the minimum requirements of the statute could explain the way LC 16.212(4)(y)(ii) is worded."

Delta first asserts that the county's interpretation was inadequate for LUBA's review. As for the substance of the review that LUBA undertook, Delta assails both of the county's proffered interpretations of LC 16.212(4)(y)(ii). Although Delta urges that LUBA's order affirming the

county's denial of its application was unlawful in substance under ORS 197.850(9)(a), we disagree and, accordingly, affirm.

### A. *Independent review under ORS 197.829(2)*

Delta initially challenges LUBA's decision by arguing that the county's interpretation of LC 16.212(4)(y)(ii) was inadequate for LUBA's review and that, as a result, LUBA should have independently interpreted the provision. Delta relies on ORS 197.829(2), which provides:

> "If a local government fails to interpret a provision of its comprehensive plan or land use regulations, or *if such interpretation is inadequate for review*, the board may make its own determination of whether the local government decision is correct."

(Emphasis added.)

Delta asserts that, because the county's interpretation was based on a flawed understanding of the Metro Plan inventory, the county's interpretation was both flawed and inadequate for review. Delta reasons as follows: First, the county concluded that the Metro Plan contained a 1B, not a 1C, inventory of aggregate sites in the donut area and the county thus interpreted LC 16.212(4)(y)(ii) while assuming that the Metro governments had failed to complete the Goal 5 process for a 1C inventory. Second, LUBA determined, correctly, that the Metro Plan inventory does, in fact, contain a 1C inventory. Third, as a result, LUBA should not have deferred to the county's interpretation, because the county's erroneous understanding of the nature of the Metro Plan inventory infected its interpretation of LC 16.212(4)(y)(ii), rendering it inadequate for review under ORS 197.829(2). Delta explains that "there would be no need to read the Lane Code to allow mining in the Metro Plan donut if there is no land in the Metro Plan area that would qualify for mining, because none of it finished the Goal 5 process." Thus, Delta urges us either to remand for LUBA's interpretation of LC 16.212(4)(y)(ii) or to interpret the provision ourselves, in accordance with *Maxwell v. Lane County*, 178 Or App 210, 35 P3d 1128 (2001), *adh'd to as modified on recons*, 179 Or App 409, 40 P3d 532 (2002).

The county and intervenors—as well as Springfield, Eugene, and the Springfield Utility Board, who similarly oppose Delta's cross-petition for review as *amici*—contravene much of Delta's argument. As in their petition for judicial review, the county and intervenors argue that the county's view of the Metro Plan as containing a 1B inventory was correct. They also dispute the centrality of that view to the county's interpretation of LC 16.212(4)(y)(ii). Finally, the county and intervenors challenge the legal premise of Delta's argument. They contend that, even if the county's view of the Metro Plan inventory were incorrect, the county expressly determined the proper interpretation of LC 16.212(4)(y)(ii), including addressing issues that Delta raised concerning construction of that provision, and so its interpretation is reviewable. Thus, they conclude, there was no occasion for LUBA to make its own independent interpretation under ORS 197.829(2).

Whatever the merits of Delta's legal argument are, we reject Delta's assumption that the Metro Plan inventory was the backbone for the entirety of the county's decision. LUBA correctly concluded that the nature of the Metro Plan inventory was a distinct issue, independent of the county's "restrictive zone" interpretation, *i.e.*, the county had authority to adopt a restrictive EFU zone and it exercised that authority in LC 16.212(4)(y)(ii).

In the section of the county's decision pertaining to zoning conformity, the county walked through each of the provisions in LC 16.212(4)(y). As to subsection (4)(y)(ii), the county's decision stated that it

"requires that the site for the mining of aggregate must be included on an inventory in the acknowledged Lane County Rural Comprehensive Plan even though the site is located within the Metro Plan jurisdictional boundary. The subject property is not included on an inventory in the acknowledged Lane County Rural Comprehensive Plan."

The decision then recited Delta's proposed interpretations of the subsection, namely, that the requirement that the mining site be on the Rural Plan inventory must be a scrivener's error and that, under ORS 215.298, all that was required was that the mining site be on "an inventory," which was

satisfied by virtue of the site's inclusion on the Metro Plan's inventory of significant sand and gravel resources.

Next, the county explained in its decision that the requirement that the site be included in the Rural Plan inventory does not involve a "scrivener's error." The county stated that

"Metro Plan designation changes occurring within the Metropolitan Area of Influence require concurrence by both Lane County and the affected city. That is not true for the zoning in that area. All that is required is that LCDC acknowledge that the zoning applied to that area conforms to the Statewide Planning Goals and is consistent with the applicable Metro Plan policies and designations."

The county provided other examples of when the Rural Plan "is the touchstone for satisfying a provision in Lane Code 16.212," and it summarized as follows:

"The point to be made is twofold. First, Lane Code 16.212 was acknowledged in substance, as complying with the Statewide Planning Goals, and in applicability to the [donut] area, by LCDC. Second, the application of policies or inventory material in the Rural Comprehensive Plan to land within the [donut] area does not, on its face, imply a scrivener's error on the part of the County."

Then, in a separate section, the county explained its authority to adopt restrictive standards in an EFU zone:

"The applicant notes that while Lane Code 16.212(4)(y)(ii) requires that the property be on the Rural Comprehensive Plan inventory, ORS 215.298 only requires that the property be on 'an inventory in an acknowledged comprehensive plan.' The applicant then posits that the subject property is on the Metro Plan inventory, that the statute trumps the code provision, and that therefore the issue is settled.

"ORS 215.213(2) lists uses that 'may' be established by a marginal lands county on land zoned for exclusive farm use. Although counties may not adopt EFU zones that are less restrictive than statutory zoning requirements, they may adopt EFU zones that are more restrictive (except for uses allowed outright by the statute). *Kenagy v. Benton County,* 112 Or App 17[, 826 P2d 1047] (1992); *Bechtold v. Jackson County,* 42 Or LUBA 204 (2002). ORS 215.213(2)(b)(B) allows mining of aggregate, subject to

ORS 215.298. Lane Code 16.212(4)(y)(ii) restricts the universe of acknowledged comprehensive plans to one, the Lane County Rural Comprehensive Plan."

That explanation of stringent EFU zoning restrictions does not depend on the nature of the Metro Plan inventory. In the absence of a key premise of Delta's argument—that the county's incorrect understanding of the nature of the Metro Plan inventory was so pivotal that it rendered the county's decision unreviewable—we need not and do not reach the merits of Delta's legal argument that ORS 197.829(2) is implicated in this case. Accordingly, we turn to the merits of the county's interpretation of LC 16.212(4)(y)(ii).

B. *Exception to deference for the restrictive-EFU-zone interpretation under ORS 197.829(1)(c)*

We first address Delta's contention that, under ORS 197.829(1), LUBA erred in deferring to the county's interpretation of LC 16.212(4)(y)(ii), focusing on the county's authority to adopt restrictive EFU zones. Whether the county's interpretation was entitled to deference is governed by ORS 197.829, which provides:

"(1) The Land Use Board of Appeals shall affirm a local government's interpretation of its comprehensive plan and land use regulations, unless the board determines that the local government's interpretation:

"(a) Is inconsistent with the express language of the comprehensive plan or land use regulation;

"(b) Is inconsistent with the purpose for the comprehensive plan or land use regulation;

"(c) *Is inconsistent with the underlying policy that provides the basis for the comprehensive plan or land use regulation*; or

"(d) Is contrary to a state statute, land use goal or rule that the comprehensive plan provision or land use regulation implements.

"(2) If a local government fails to interpret a provision of its comprehensive plan or land use regulations, or if such interpretation is inadequate for review, the board may make its own determination of whether the local government decision is correct."

(Emphasis added.) Delta relies only on ORS 197.829(1)(c), arguing that the county's interpretation of its code provision was inconsistent with one of the county's own policies.

Delta identifies the Rural Plan's Goal 3, Policy 13 (Policy 13) as containing the relevant plan policy addressing aggregate mining uses on EFU land. Policy 13 provides:

> "No County policy shall be construed to exclude permitted and specially permitted nonfarm uses, as defined in ORS Chapter 215.213 and OAR 660 Division 33, from the EFU zones. Implementing ordinances shall provide for such uses, consistent with the statutory and OAR 660 Division 33 requirements. Special permits for commercial uses in conjunction with farm use shall have the same effect as making the use an outright permitted use on the affected parcel."

Delta construes Policy 13 as prohibiting the county from interpreting LC 16.212(4)(y)(ii) to exclude any of the uses permitted by ORS 215.213, including operations conducted for mining, crushing, and stockpiling of aggregate resources, a use identified in ORS 215.213(2)(d)(B). In Delta's view, the county's interpretation conflicts with Policy 13 because the interpretation "effectively prohibits mining in the donut area in contravention of this policy."

The problem with that argument is that Delta's reading of Policy 13 goes further than its terms allow. The first part of Delta's argument focuses on whether the county's "implementing ordinances" properly "provide for" permitted nonfarm uses as required by Policy 13. Delta is unable to contend that the county's interpretation of LC 16.212(4)(y)(ii) excludes all permitted uses from EFU zones; to the contrary, the county's interpretation of LC 16.212(4)(y)(ii) does "provide for" or allow some aggregate mining within the county's EFU zones, if the proposed use meets certain requirements. Instead, Delta argues that the interpretation limits mining *within the donut area* inconsistently with Policy 13. However, Policy 13 does not, by its terms, require the county to allow aggregate mining on all agricultural properties within the county or within all areas of the county.

The second part of Delta's argument focuses on whether the county's interpretation of LC 16.212(4)(y)(ii) is

"consistent with" statutory and regulatory requirements, as Policy 13 requires.[5] LUBA concluded that the interpretation of LC 16.212(4)(y)(ii) was consistent with both the minimum standards for mining uses in EFU zones provided in ORS 215.298 and with ORS 215.296(10),[6] which allows the county to regulate the proposed aggregate mining use more stringently than stated in ORS 215.298. Delta acknowledges that a local government has the option under state law to impose additional standards and conditions for aggregate mining uses in EFU zones. However, Delta argues that LUBA wrongly credited the county with that explanation, and so LUBA should not have considered it.

We do not read the county hearing official's decision as restrictively as Delta does; rather, we conclude that the county articulated the reasoning that LUBA identified in it. Again, that decision stated that, "[a]lthough counties may not adopt EFU zones that are less restrictive than statutory zoning requirements, they may adopt EFU zones that are more restrictive (except for uses allowed outright by the statute)." The county's decision then stated that LC 16.212(4)(y)(ii) "restricts the universe of acknowledged comprehensive plans to one, the Lane County Rural Comprehensive Plan." Although Delta characterizes that part of the county's decision as a counterargument, in light of the decision as a whole, LUBA correctly understood that the county viewed the code provision as a permitted restriction on uses within the EFU zone and that that was a basis for the county's interpretation of the code provision.

---

[5] In part, Policy 13 also provides that no county "policy" shall be construed to exclude permitted uses. Asserting that the term "policy" as used in Policy 13 refers to a comprehensive plan policy, the county and intervenors argue that none of the county's plan policies is being used to exclude permitted uses on EFU-zoned land. For its part, Delta does not identify any policy, whether an RCP policy or not, that the county is using to deny Delta's application or that is contrary to Policy 13.

[6] ORS 215.296(10) provides:

"This section does not prevent a local governing body approving a use allowed under ORS 215.213(2) [which includes aggregate mining] *** from establishing standards in addition to those set forth in subsection (1) of this section or from imposing conditions to ensure conformance with the additional standards."

In sum, the county's interpretation of LC 16.212(4)(y)(ii) as providing a restrictive EFU zone is consistent with Policy 13. Contrary to Delta's argument, ORS 197.829(1)(c) did not eliminate the requirement for LUBA to defer to the county's interpretation of its own code provision.

Delta also challenges the county's other interpretation of LC 16.212(4)(y)(ii), namely, that it requires that the Rural Plan inventory of significant mineral and aggregate sites be amended to adopt the Metro Plan's inventory of significant sites in the donut area. Delta asserts that the county's interpretation was implausible as a matter of law, because it was predicated on the county's faulty understanding that the Metro Plan did not contain a 1C inventory of aggregate sites in the donut area. Hence, once LUBA determined that the Metro Plan contained a 1C inventory of sites under the Goal 5 rule, crucial support for the county's interpretation evaporated, rendering the interpretation implausible. On that basis, Delta invokes *Siporen* and asserts that LUBA erroneously concluded that it had to defer to the county's interpretation.[7] But in light of our conclusion that LUBA did not err with respect to its consideration of the county's interpretation of LC 16.212(4)(y)(ii) as providing a restrictive EFU zone, we need not and do not consider the county's additional interpretation. LUBA's deference to the county's interpretation of LC 16.212(4)(y)(ii) was not unlawful in substance. As a result, we affirm that part of LUBA's order affirming the county's denial of Delta's application to mine on EFU-zoned land that is not included in the Rural Plan's inventory of significant aggregate resource sites.

### III. COUNTY AND INTERVENORS' PETITION FOR REVIEW

On judicial review, the county and intervenors challenge LUBA's decision on Delta's first assignment of error

---

[7] Delta does not rely on any provision in ORS 197.829(1) to make its argument. We note that Delta's argument invites us to apply a free-standing test of plausible interpretation under *Siporen*, separate from the bases for denying deference stated in ORS 197.829(1), when we review whether LUBA was required to defer to a local government's construction of its own ordinance. The county and intervenors do not argue that we must decline that invitation in light of the legislature's enactment of ORS 197.829(1), although *amici* Springfield and the Springfield Utility Board suggest otherwise.

before LUBA. They contend that (1) LUBA erroneously concluded that the Metro Plan inventory is a 1C inventory after a completed Goal 5 review of conflicting uses and (2) LUBA erred because, even though the county was but one of the three Metro Plan governments, LUBA was required, but failed, to give the county's interpretation of the Metro Plan appropriate deference under ORS 197.829. *Amici* City of Springfield and the Springfield Utility Board support that position. The county, intervenors, and *amici* further urge us to reach LUBA's determination, regardless of the outcome on Delta's cross-petition for review. They contend that the decision will have precedential effect on the Metro governments and other landowners within the Metro Plan territory, both as to land use decisions and planning and as to the level of deference to which the Metro governments are entitled when making determinations under the Metro Plan.

For its part, Delta does not dispute the ramifications of LUBA's decision on its first assignment on future land use decisions touching on the Metro Plan inventory. Delta supports LUBA's decision, arguing that LUBA engaged in a historical analysis to determine what LCDC had done when it acknowledged the Metro Plan and its inventory of aggregate resources. In Delta's view, because LUBA was not passing on a local government's interpretation of its own legislation, LUBA was not obliged to defer to the county; rather, the county and intervenors are presently engaged in a collateral attack on LCDC's acknowledgment, which comes decades too late.

We proceed to address LUBA's decision on Delta's first assignment of error before LUBA, which is within our scope of review. Because we conclude that LUBA applied an incorrect standard of review, we reverse and remand for LUBA to reconsider the Metro Plan inventory issue in light of our decision.

We pause to provide background for the county's decision on the Metro Plan inventory issue and LUBA's review of that decision and then summarize those decisions. The background of the decisions is complex.

Most of the review of areas within the Metro Plan was done under Goal 5 alone. LCDC specified six deficiencies and issued six compliance requirements to the Metro

Plan governments in the 1981 Goal 5 Addendum, and they pertained to areas both within the urban growth boundary and outside it.

We note the first two of the 1981 compliance requirements. The first of LCDC's compliance requirements was as follows:

"The Metro Area Plan and Supporting Documents must be amended to:

"1.  Include a consolidated natural resource map or maps which clearly define the location of sites where conflicting uses are prohibited or limited. Figures 1, 2, and D3 of the Working Papers are particularly relevant to this task. Potential conflicts to be considered include low density residential development, aggregate extraction, timber harvesting, farm practices, industrial development and rural development."

In response, the Metro Plan governments submitted Metro Plan Technical Report Map 3 to comply with the requirement to provide a consolidated natural resource map that defined "the location of sites where conflicting uses are prohibited or limited." The governments' response was that the

"Metro [P]lan has been amended to include a consolidated natural resource map (Map 3, General Plan Technical Report). In addition, very detailed site specific maps of each natural resource site are provided in the amended Natural Resource working paper. Resources mapped include wetland vegetation, sand and gravel, significant vegetation and wildlife areas, and slopes."

Map 3 is unquestionably part of the Metro Plan; the parties dispute its significance.

The second of the 1981 Goal 5 compliance requirements concerned specific sites that were subject to objections under the first Goal 5 rule. LUBA required the Metro governments to amend the Metro Plan to:

"2.  Include a separate evaluation of the 'ESEE' consequences of allowing conflicting uses for those sites which are the subject of a Goal 5 objection filed pursuant to OAR 660-16-000 (i.e., Sites 4, 5, 7, 12, 19, 21

and 28 shown on Figure D-3). For specific direction on individual sites see underscored portions of Comments and Objections subsection, preceding."

In 1982, the Metro governments responded as follows:

"This requirement is addressed in the working paper 'Natural Resource Areas: Conflict Resolution for Significant Areas' (adopted December 1981). This paper contains detailed maps showing the location and boundaries of each of the sites inside the [urban growth boundary]. Refined inventory information is provided and the conflict resolution process is discussed. Sites outside the [urban growth boundary] which were required to be addressed have not been included in the submittal. These sites will be reviewed by LCDC concurrent with the Lane County resubmittal."

In 1982, LCDC acknowledged the Metro Plan as it applied inside the urban growth boundary. However, the Metro Plan governments were required to undertake further efforts to obtain acknowledgment as to the donut area. Among other things, LCDC required the Metro Plan governments to include an evaluation of the conflicting uses for sites that were "the subject of a Goal 5 objection filed pursuant to OAR 660-16-000."

In 1984, Lane County requested that its comprehensive plan be acknowledged for areas outside the urban growth boundary. In response, LCDC described Lane County's inventory of aggregate resources in 1984 in this way:

"Lane County inventoried its aggregate supplies by examining permit lists from the Department of Geology and Mineral Industries and the Division of State Lands, by conducting telephone searches, taking on-site tours of aggregate-producing areas; and by talking with industry representatives (p. 6). The locations of 30 identified sites appear on a map in Appendix C and are listed by legal descriptions and tax lot numbers in Appendix D. A more extensive list of all tax parcels having any record of previous aggregate extraction is included in Appendices E and F. Appendix D is considered the County's (1C) inventory for lands outside the Metro Planning area. Appendix E is the (1B) inventory for lands inside the Metro Area. Appendix F is the (1B) inventory for lands outside the Metro Area

(confirmed by Mike Copely, Lane County Planner, personal communication, July 16, 1984)."

The Department of Land Conservation and Development (DLCD) staff report noted that the 30 sites in Appendix D had been evaluated against potential conflicting uses. The DLCD staff report observed that LC 16.217 governed the sand, gravel, and rock products zone, or SG zone, and that "the SG Zone shall only be applied to those sites which have been evaluated consistently with the Statewide Planning Goal No. 5 Administrative Rule conflict resolution process." (Internal quotation marks omitted.)

LCDC determined in 1984 that the county's Rural Plan did not comply with Goal 5 and continued the county's request for acknowledgment. LCDC noted that the county had zoned a number of sites as SG that were "not included on any plan inventory of (1C) sites" and that "contrary to the zone's purpose statements, the County has not applied the Goal 5 process to these sites to justify SG zoning."

The Metro Plan governments also requested acknowledgment of the Metro Plan for the donut area in 1984, but LCDC continued that request, too. Specifically with respect to mineral and aggregate resources, LCDC required both the county and the Metro Plan governments to

"[a]pply the Goal 5 process to sites zoned SG which are not included on the County's (1C) inventory and, based on an analysis of the ESEE consequences of conflicting uses, either (1) add them to the (1C) inventory if justified, or (2) rezone the sites for other uses."

Finally, in 1985, LCDC acknowledged both the Rural Plan and the Metro Plan as it applied to the donut area.

In its decision on Delta's application, the county made specific findings on the status of Delta's proposed mining expansion area and concluded that the site was not included on a 1C Goal 5 inventory of significant aggregate sites because the site was not zoned SG for sand and gravel mining. In part, the county summarized some of the history of the Metro Plan inventory to assess Delta's application, as follows:

"The update of the 1990 Plan in regard to Statewide Planning Goal #5 primarily relied upon two working papers published on April 12, 1978; Natural Assets and Constraints and Sand and Gravel Resources. The former described the methodology and process of identifying assets and constraints in the metropolitan area and determined that sand and gravel resource areas were to be deemed a significant natural resource in the metropolitan area. (Pg. 6) The applicant asserts that Figure E-1 of this working paper constitutes the Metro Plan Goal 5 inventory of significant mineral and aggregate resources. However, this map of aggregate resources was compiled, not on the basis of a supply and demand analysis, but rather in recognition that the resource was (1) necessary for construction; (2) was nonrenewable; and (3) had proximity to the metropolitan area, which had a bearing on associated transportation costs for the product. The map basically represents a 1967 study by the Lane County Public Works Department. Thus, Table 1 of the working paper (Pg. E-3), which is displayed on Figure 1-1, shows the total amount of aggregate resource identified in the 1967 study.

"The supply of and demand for aggregate resources in the metropolitan area was reviewed in more detail in the Sand & Gravel Resources working paper. This working paper recognized that the best available data on aggregate resources in the metropolitan area came from a 1967 study done by Lane County Public Works and that because that study did not make a determination about the appropriateness of aggregate resource management as opposed to other uses, such as agriculture, open space, recreation, etc., the resource areas were quite large and were not all designated as resource areas in related land use plans.

"* * * * *

"In allocating sand and gravel use, known sand and gravel areas were treated as a prohibition to development. (Plan Diagrams Update Alternatives Technical Report, Map No 5: Metro Plan Update Private Vacant Land, page III-8) The urban growth boundary was drawn to exclude the larger known sand and gravel resource area in order to exclude it from development. The preliminary conflict analysis identified potential long-term conflicts in areas of agricultural productivity and certain known sand and gravel resource areas were excluded from the plan diagrams.

"*  *  *  *  *

"The Metro Area Plan's consistency with Goal 5 was first reviewed by LCDC at its September 1981 meeting. The DLCD staff report for this meeting, dated August 14, 1981, specifically examined the Plan's treatment of sand and gravel resources. In regard to sand and gravel, DLCD staff noted that many Goal 5 resource conflicts were resolved by excluding sites from the [area within the urban growth boundary] and that most sites were protected by either the 'Open Space and Parks' or 'Sand and Gravel' plan designations. DLCD staff further noted that the Metro Area Plan provided policy guidance to protect the sand and gravel resource from premature urban development and also mandated that Lane County conduct studies to determine 'the location, quality, and quantity of sand and gravel resources within the resource areas in the technical supplement.'"

(Footnote omitted; underscore in original.)

The county concluded that Delta's expansion site was not on a 1C inventory of significant aggregate resources that had been subject to a complete Goal 5 review process that involved an analysis of conflicting uses. The county rejected Delta's contention that Map 3 of the Metro Plan Technical Supplement demonstrated that its expansion site was on such an inventory, reasoning as follows:

"1.  As demonstrated in the language of the working papers, and by acknowledgment by DLCD staff, aggregate sites that were not subject to current extraction were excluded from the urban growth boundary to allow for the postponement of a conflict analysis.

"2.  Six of the 11 lots comprising this application were included in the previous application for a plan amendment. The City of Eugene made an explicit finding that the property subject to that application was not on an inventory of significant aggregate sites in an acknowledged plan on September 1, 1996.

"3.  OAR 660-016 provides that sites can be put on an inventory but must complete the Goal 5 process at a later date. This equates to Lane County's definition of a '1B' site. Lane County's Aggregate and Mineral Policy #10 requires that for '1B' sites be evaluated within 5 years. Unfortunately, there is no Metro Plan

Policy that express[es] its intent to address the undesignated resource sites and proceed through the Goal 5 process in the future.

"Lane County's Mineral & Aggregate Resources Working Paper (Feb, 1982) determined that only existing aggregate sites deemed of sufficient importance would be retained on the RCP inventory. Appendix D listed those sites. Appendix E contained a generalized list of aggregate resource sites inside the projected metropolitan area. Only about half of the sites listed were identified by tax lot, including the township/range/section number that includes the subject property. This inventory, however, is more precise than mere reliance on Map 3 of the Metro Plan Technical Supplement.

"4.     * * * [S]ome 7,450 acres of aggregate resource land are undesignated or zoned for aggregate resource. Yet no documentation exists indicating that a Goal #5 conflict analysis was conducted for this property despite exhaustive documentation of the Metro Plan's update process, public involvement, and resource inventory. The only discussion is that active sites will be zoned and designated for S&G and specific sites (e.g. Pudding Creek Heronry) be evaluated * * *."

LUBA sustained Delta's first assignment of error to that decision. LUBA itself undertook a *de novo* review of the Metro Plan as well as documents surrounding LCDC's acknowledgment of the Metro Plan. LUBA noted that Appendix E in the Rural Plan had been eliminated and that it understood the county to be arguing that any aggregate site of significance was required to be on Appendix D. LUBA then concluded that the county's interpretation of the significance of Map 3 was wrong, because the county had not established that "Appendix D was adopted or acknowledged in place of Metro Plan Technical Report Map 3 as the inventory of significant aggregate resources for the donut area." LUBA concluded that Map 3 contained a 1C inventory of significant aggregate resources, including sites within the donut area:

"The Natural Assets and Constraints Working Paper and [Sand & Gravel Resources working paper] are ambiguous regarding the nature of the inventories contained

therein and can be read in ways that support both Delta's and [the county and intervenors'] position. But (1) LCDC's compliance requirement, (2) the submission of the Metro Plan Technical Report Map 3 as a response to that directive, and (3) the subsequent LCDC acknowledgement order staff report describing Metro Plan Technical Report Map 3 make it reasonably clear that LCDC understood that all of the mineral resource areas depicted on that map were proposed for inclusion in the Metro Plan's 1C inventory for mineral and aggregate resources in the donut area. The subsequent acknowledgment of the Lane County RCP, which included a failed attempt either to (1) reflect what the county mistakenly thought Metro Plan Technical Report Map 3 already reflected or (2) unilaterally convert some 1C sites to a 1B special category designation reinforces that understanding. We conclude the Metro Plan Technical Report Map 3 is the Metro Plan [inventory of significant aggregate resources], or the inventory of 1C sites. The county erred in concluding that [Sand & Gravel Resources working paper] Figure 2 (which shows only the resource sites designated S-G) rather than Metro Plan Technical Report Map 3, constitutes the Metro Plan [inventory of significant aggregate resources]."

In doing so, LUBA addressed the nature of its standard of review of the county's decision, insofar as it interpreted the Metro Plan. LUBA concluded that, based on a line of Oregon Supreme Court cases dealing with deference to a single local government's interpretation of its own land use regulation, no such deference is owed when a single local government interprets a comprehensive plan that was concurrently adopted by other governments, such as the Metro Plan. Thus, LUBA stated, the county's interpretations of the Metro Plan are not entitled to deference under ORS 197.829(1) and *Siporen.*

We first address LUBA's standard of review, because it is dispositive. Contrary to LUBA, we conclude that the county's interpretations of the Metro Plan are entitled to deference. Our conclusion is derived from the text and context of ORS 197.829.

Distinct from an analysis of the statute, LUBA determined that no deference was owed to the county's interpretation of the Metro Plan in light of the Oregon Supreme

Court's articulation of two principles derived from case law concerning whether a local government's decision was correct. *See Gage v. City of Portland*, 319 Or 308, 316-17, 877 P2d 1187 (1994). In *Gage*, the Supreme Court stated that "deference is due a local governing body's interpretation of its own ordinance" because, first, "that governing body is composed of the politically accountable representatives elected by the community affected by the ordinance" and second, "because that governing body is the legislative body responsible for enacting the ordinance and may be assumed to have a better understanding than LUBA or the courts of the intended meaning of the ordinance." *Id.* LUBA reasoned that neither principle applies to the county. LUBA also took note of *dicta* in our decision in *Jaqua v. City of Springfield*, 193 Or App 573, 580 n 3, 91 P3d 817 (2004), in which we questioned, but did not decide, "whether ORS 197.829 requires deference to an interpretation by only one participant when land use regulations are promulgated by multiple land use planning bodies."

We first note that *Gage* was not a decision under ORS 197.829. In addition, ORS 197.829 is not a simple codification of the principles that had been articulated in the germinal Supreme Court case that preceded *Gage*, namely, *Clark v. Jackson County*, 313 Or 508, 836 P2d 710 (1992). Both subsections (1)(d) and (2) of the statute are not derived from Supreme Court case law. In addition, as the county, intervenors, and *amici* point out, ORS 197.829 does not refer to an interpretation by a "governing body" or "elected governing body" as the court discussed in *Gage*. Thus, we conclude that a proper resolution of the issue demands statutory analysis of ORS 197.829.

Subsection (1) of ORS 197.829 provides that LUBA "shall affirm a local government's interpretation of its comprehensive plan and land use regulations," unless LUBA determines that there are inconsistencies between that interpretation and (a) "the express language," (b) "the purpose," or (c) "the underlying policy" of the plan and land use regulations, or that interpretation is "contrary to a state statute, land use goal or rule that the comprehensive plan provision or land use regulation implements." The deference normally accorded under ORS 197.829(1) thus applies to

(1) a local government's (2) interpretation of (3) its comprehensive plan.

By its terms, ORS 197.829 applies here. The Metro Plan is a comprehensive plan of a local government, namely, the county, and the county, in part, provided an interpretation of the Metro Plan in its decision in this case. We reject Delta's argument that the Metro Plan inventory issue is, at base, the county's collateral attack on LCDC's acknowledgment of the plan. Delta does not contest that the inventories are part of the Metro Plan and that the county provided an interpretation of Map 3, albeit one that contradicted Delta's proffered interpretation. As Delta admits in its answering brief, the inventory issue is about the Metro Plan, in contrast to the county code provisions.

Furthermore, in light of the legislature's codification of the holding in *Clark* through the exceptions listed in ORS 197.829(1)(a) to (c), we note that our reading of the statute comports with the policies behind that holding. First, the county commissioners are politically accountable representatives elected by the community affected by the Metro Plan. Section 10(3) of the Lane County Charter provides for five election districts, both within and outside the Springfield and Eugene metropolitan areas, one for each of the five positions on the board of commissioners. Three of the five election districts are located within the City of Springfield and the City of Eugene. Lane County Charter § 10(3). Thus, the county's commissioners are accountable to the residents of the two other local governments that also adopted the Metro Plan.

Second, the board of county commissioners is a legislative body responsible for enacting the Metro Plan and so may be assumed to have a better understanding than LUBA or the courts of the intended meaning of the Metro Plan. Although Delta emphasizes that the Metro Plan is also the comprehensive plan adopted by the two other regional local governments, the county, as one of the governments not only adopting the plan but also guided by the plan, has the kind of expertise that the Supreme Court describes in *Gage*. Indeed, the county alone is charged with deciding land use applications of the kind at issue here. Only the county is

responsible for administering applicable zoning ordinances in the donut area of the Metro Plan, and the county needs no concurrence from either the City of Eugene or the City of Springfield to do so.

In contrast, Delta highlights that the Metro Plan inventories were adopted by all three local governments. Delta also suggests that the reference in ORS 197.829(1) to the local government's interpretation of "its" comprehensive plan conveys a possessive quality that cannot apply to a regional plan adopted by multiple governments. But the statute does not limit the application of deference to be afforded to a local government's interpretation of its comprehensive plan when that government is interpreting a regional comprehensive plan. We also note that this is not a case in which differing local governments that have all adopted a regional plan are in conflict over its interpretation, when the difficulty of according deference would be evident.

Last, we recognize the logic of *amici*'s contention that to fail to recognize deference for the county's interpretations of the Metro Plan in this case would discourage regional, coordinated planning efforts by local governments. That is because interpretations of jointly adopted plans and land use regulations would be more readily susceptible to legal challenges and to adverse determinations by LUBA and the courts than if each local government had adopted an independent plan and land use regulations on its own.

Accordingly, we conclude that LUBA was required to determine whether to give the county's interpretations of the Metro Plan deference. In this case, LUBA did not determine whether any exception to deference under ORS 197.829(1) was applicable. As the factual summary above reflects, the county determined, based in part on its interpretation of parts of the Metro Plan, that Delta's proposed expansion site was not on a 1C inventory of aggregate resources. Likewise, based in part on its interpretation of parts of the Metro Plan, without regard to any statutory requirement to give deference to the county's interpretations, LUBA concluded that the county's decision was incorrect. LUBA failed to comply with ORS 197.829(1) and failed

to consider whether the county's interpretations of the Metro Plan were plausible.

We therefore reverse LUBA's decision in favor of Delta on Delta's first assignment of error before LUBA and remand for LUBA to conduct an analysis that gives due deference to the county's interpretation of the Metro Plan. Hence, we do not reach the argument by the county, intervenors, and *amici* that LUBA misunderstood what LCDC had acknowledged.[8]

## IV. CONCLUSION

On Delta's cross-petition for review, we affirm that part of LUBA's order affirming the county's decision denying Delta's application for a special use permit for its proposed mining expansion. On the county and intervenors' petition for review, we reverse LUBA's order on Delta's first assignment of error and remand for LUBA to conduct an analysis that gives due deference to the county's interpretation of the Metro Plan.

On petition, reversed and remanded; on cross-petition, affirmed.

---

[8] In general, the county, intervenors, and *amici* disagree with LUBA on the significance of Map 3, which they contend was never adopted by the three Metro Plan governments as a 1C inventory of significant aggregate resources. Rather, they argue, Map 3 was informed by earlier studies and maps done in 1967 and 1978 that "consistently pointed to the need for further detailed analysis" and contend that the Metro Plan in other respects deferred further analysis of all sites except those designated as SG in the Metro Plan.